1   JEFFREY A. MILLER (STATE BAR NO. 160602)
    jmiller@orrick.com
2   JASON S. ANGELL (STATE BAR NO. 221607)
    jangell@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
4   Menlo Park, CA  94025
    Telephone:     +1-650-614-7400
5   Facsimile:     +1-650-614-7401

6   Attorneys for Plaintiff
    NextG Networks, Inc.

7

8                   UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12  NextG Networks, Inc., a Delaware            Case No.  c 08-01565-VRW
    Corporation,
13                                              **DECLARATION OF JEFFREY A.**
                    Plaintiff,                  **MILLER IN SUPPORT OF NEXTG**
14                                              **NETWORKS, INC.'S MOTION TO**
           v.                                   **STRIKE AND MOTION TO DISMISS**
15
    NewPath Networks, LLC, a New Jersey         Date:      August 28, 2008
16  Limited Liability Corporation,              Time:      2:30 p.m.
                                                Judge:     Hon. Vaughn R. Walker
17                  Defendant.

18

19          I, Jeffrey A. Miller, declare:

20          1.      I am a partner at the law firm of Orrick, Herrington & Sutcliffe, LLP, counsel of

21  record for plaintiff NextG Networks, Inc. ("NextG") in this action.  I am licensed to practice law

22  in the State of California and a registered United States patent attorney.  I have personal

23  knowledge of the facts stated herein, and I could and would testify competently thereto if called

24  as a witness.

25          2.      On October 28, 1997, U.S. Patent No. 5,682,256 (the " '256 patent") was issued to

26  Andrew James Motley and Anthony Gerard Chadney.  By virtue of assignment, British

27  Telecommunications PLC acquired all right, title and interest in and to the '256 patent, including

28  rights to maintain the present suit for infringement thereof.  British Telecommunications PLC

DECLARATION OF JEFFREY A. MILLER
C 08-01565-VRW

assigned all its right, title and interest in and to the '256 patent to Microwave Photonics, Inc., including rights to maintain the present suit for infringement thereof.  On or about February 22, 2005, Microwave Photonics, Inc. assigned all its right, title and interest in the '256 patent to NextG, including rights to maintain the present suit for infringement thereof.

3.    Attached hereto as **Exhibit 1** is a true and correct copy of NextG's Complaint filed with the Court on or about March 21, 2008.

4.    Attached hereto as **Exhibit 2** is a true and correct copy of NewPath's Answer, Affirmative Defenses, and Counterclaims filed with the Court on or about May 15, 2008.

5.    Defendant NewPath Networks, LLC ("NewPath") alleges in its Answer, Affirmative Defenses, and Counterclaims that NextG's predecessors-in-interest did not disclose a European patent application designated "EP 93 30 6447" to the U.S. Patent and Trademark Office during the prosecution of the '256 patent.  On or about June 4, 2008, I conducted a search for the European patent application designated "EP 93 30 6447" on the European Patent Office's website, which contains an on-line database for European patents and patent applications, located at http://ep.espacenet.com/numberSearch?locale=en_EP.  However, no record could be found for a European patent application designated "EP 93 30 6447."  Attached hereto as **Exhibit 3** is the result of that search of the European Patent Office's website's on-line database.  Records, however, were found for European Patent Application Nos. EP 93 30 6446 and EP 93 30 6448. Both applications were filed on August 16, 1993.

6.    A true and correct copy of European Patent Application No. EP 93 30 6446 that I obtained from the European Patent Office's website is attached hereto as **Exhibit 4**.  This European Patent Application was assigned publication number EP 0 869 661 A1, and was originally filed with the European Patent Office on August 16, 1993.

7.    A true and correct copy of European Patent Application No. EP 93 30 6448 that I obtained from the European Patent Office's website is attached hereto as **Exhibit 5**.  The European Patent Application was assigned publication number EP 0 583 963 A1, and was originally filed with the European Patent Office on August 16, 1993.

DECLARATION OF JEFFREY A. MILLER
C 08-01565-VRW

8.      A copy of *Xilinx, Inc. v. Altera Corp.*, 1994 Westlaw 782236 *1, 1994 U.S. Dist. LEXIS 19362 * 1 (N.D. Cal. 1994) is attached hereto as **Exhibit 6**.

I declare under penalty of perjury under the laws of the Untied States of America that the foregoing is true and correct.

Executed this the 9th day of June, 2008, at Menlo Park, California.


/s/ Jeffrey A. Miller /s/
Jeffrey A. Miller

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 9, 2008.

Dated:  June 9, 2008.                          Respectfully submitted,

/s/ Jeffrey A. Miller /s/

Jeffrey A. Miller

DECLARATION OF JEFFREY A. MILLER
C 08-01565-VRW

# **EXHIBIT 1**

COPY

08 MAR 21 PM 1: 39

FICHARD W. WIEKING
U.S. LIT DIST COURT

ADR

E-FILING

1  JEFFREY A. MILLER (State Bar No. 160602)
   JASON S. ANGELL (State Bar No. 221607)
2  Orrick, Herrington & Sutcliffe LLP
   1000 Marsh Road
3  Menlo Park, CA 94025
   Telephone:    (650) 614-7400
4  Facsimile:    (650) 614-7401
   jmiller@orrick.com
5  jangell@orrick.com

6  Attorneys for Plaintiff
   NextG Networks, Inc.

7

8

9

10                 UNITED STATES DISTRICT COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13

14
   NextG Networks, Inc., a Delaware         C08    01565
15 corporation,
                                            VRW
16                Plaintiff,
                                      COMPLAINT FOR INFRINGEMENT
17        v.                          OF UNITED STATES PATENT NO. 5,682,256

18 NewPath Networks LLC, a New Jersey DEMAND FOR JURY TRIAL
   limited liability corporation,
19
                  Defendant.
20

21

22      Plaintiff, NextG Networks, Inc. (hereinafter "NextG"), by and through its undersigned

23 attorneys, hereby brings this patent infringement suit against defendant NewPath Networks LLC

24 (hereinafter "NewPath"), and in support thereof alleges the following:

25

26

27

28

                                        COMPLAINT FOR INFRINGEMENT OF UNITED STATES
                                        PATENT NO. 5,682,256 AND JURY DEMAND

1                          **JURISDICTION AND VENUE**

2          1.      This is an action for patent infringement arising under the patent laws of the

3    United States, Title 35, United States Code.

4          2.      The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, and 1338.

5          3.      Venue is established under 28 U.S.C. § 1391(b).

6                               **THE PARTIES**

7          4.      Plaintiff NextG is a corporation existing under and by virtue of the laws of the

8    State of Delaware and maintains a principal place of business within Santa Clara County at 2216

9    O'Toole Avenue, San Jose, California 95131. NextG is engaged in the sale, design and

10   construction of "Distributed Antenna Systems" utilizing what are called "Base Station Hotels".

11   NextG's Distributed Antenna Systems allow wireless service providers to implement wireless

12   networks such as cellular telephone service where cell phone towers are undesirable, too

13   expensive or not feasible.

14         5.      On information and belief, defendant NewPath is a limited liability corporation

15   existing under and by virtue of the laws of the State of New Jersey and maintains a principal

16   place of business at 1300 N Northlake Way, Seattle, Washington 98103. NewPath is engaged in

17   the design, construction, offering for sale and sale of Distributed Antenna Systems using Base

18   Station Hotels.

19         6.      On information and belief, NewPath has, in Contra Costa County, and Alameda

20   County, offered to sell Distributed Antenna Systems using Base Station Hotels.

21         7.      On information and belief, NewPath has, in connection with its efforts to market,

22   sell and construct its Distributed Antenna Systems using Base Station Hotels, created and

23   disseminated to customers and potential customers throughout the United States and in this

24   venue, technical literature, including specifications, responses to Requests for Proposals, for

25   NewPath's Distributed Antenna Systems using Base Station Hotels, and threatens to continue

26   these activities.

27         8.      On information and belief, NewPath has had numerous communications and

28   contacts with customers and potential customers in the United States and in this venue in

                                                - 2 -

1  connection with selling and constructing its Distributed Antenna Systems using Base Station

2  Hotels, and threatens to continue these activities.

3        9.      On information and belief, NewPath has engaged in and is currently engaged in

4  substantial efforts to sell its Distributed Antenna Systems using Base Station Hotels in the United

5  States and in this venue, and to induce others to use its distributed antenna systems.

6  **COUNT I - INFRINGEMENT OF U.S. PATENT NO. 5,682,256**

7        10.      The allegations of paragraphs 1-9 above are incorporated for this Count I as

8  though fully set forth herein.

9        11.      On October 28, 1997, U.S. Patent No. 5,682,256 ("the '256 patent"), which

10  discloses and claims an invention entitled COMMUNICATIONS SYSTEM, was duly and legally

11  issued in the names of Andrew James Motley and Anthony Gerard Chadney.  A true and correct

12  copy of U.S. Patent No. 5,682,256 is attached hereto as Exhibit A.

13        12.      By virtue of assignment, British Telecommunications PLC acquired all right, title,

14  and interest in and to the '256 patent, including rights to maintain the present suit for

15  infringement thereof.

16        13.      On or about February 4, 2005, British Telecommunications PLC assigned all right,

17  title and interest in and to the '256 patent to Microwave Photonics Inc., including rights to

18  maintain the present suit for infringement thereof.

19        14.      On or about February 22, 2005, Microwave Photonics Inc. assigned all right, title

20  and interest in and to the '256 patent to NextG, including rights to maintain the present suit for

21  infringement thereof.

22        15.      NewPath is making, using, offering to sell and selling the same, Distributed

23  Antenna Systems using Base Station Hotels that infringe on one or more claims of the '256

24  patent, in violation of 35 U.S.C. §§ 271 *et seq.*

25        16.      NewPath is contributing to infringement of one or more claims of the '256 patent

26  by offering to sell and selling its Distributed Antenna Systems using Base Station Hotels, in

27  violation of 35 U.S.C. § 271(c) to customers, buyers, users and others that directly infringe the

28  '256 patent.

COMPLAINT FOR INFRINGEMENT OF UNITED STATES
PATENT NO. 5,682,256

1     17.    NextG has suffered damage by reason of NewPath's infringement of the '256

2  patent, and will suffer irreparable damage and impairment of the value of its patent rights unless

3  NewPath is enjoined by this Court from infringing the '256 patent.

4     18.    On information and belief, NewPath's acts of infringement have been, and, if not

5  ceased immediately, will be committed with full knowledge of NextG's rights under the '256

6  patent, and in willful and wanton disregard thereof, rendering this an exceptional case under 35

7  U.S.C. § 285.

8                              **PRAYER FOR RELIEF**

9     WHEREFORE, NextG prays that this Court enter a judgment and decree:

10    A.    That finds that NewPath has infringed, and continues to infringe and threatens to

11  infringe, U.S. Patent No. 5,682,252;

12    B.    Preliminarily and permanently enjoining NewPath, its officers, directors,

13  employees, agents and all persons in active concert with any of them from infringing, and

14  inducing others to infringe U.S. Patent No. 5,682,256;

15    C.    Awarding NextG damages based on defendant NewPath's infringement of U.S.

16  Patent No. 5,682,256, together with pre- and post-judgment interest and costs under 35 U.S.C. §

17  284, and trebling the same by reason of the willful, wanton, and deliberate nature of such

18  infringement pursuant to 35 U.S.C. § 284;

19    D.    Awarding NextG its costs and reasonable attorney fees pursuant to 35 U.S.C. §

20  285.

21    E.    Granting NextG such other and further relief as this Court deems proper and just.

22

23  Dated: March 21, 2008              ORRICK, HERRINGTON & SUTCLIFFE LLP

24

25                                   JEFFREY A. MILLER
                                     JASON S. ANGELL
26                                   Attorneys for Plaintiff NextG Networks, Inc.

27

28

-4-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff NextG Networks, Inc. hereby demands a trial by jury as to all issues in this action triable by jury.

Dated: <u>March 21, 2008</u>                    ORRICK, HERRINGTON & SUTCLIFFE LLP


JEFFREY A. MILLER
JASON S. ANGELL
Attorneys for Plaintiff NextG Networks, Inc.

COMPLAINT FOR INFRINGEMENT OF UNITED STATES
PATENT NO. 5,682,256

# EXHIBIT A

US005682256A

# United States Patent [19]

## Motley et al.

[11] Patent Number: 5,682,256

[45] Date of Patent: Oct. 28, 1997

[54] **COMMUNICATIONS SYSTEM**

[75] Inventors: **Andrew James Motley**, Woodbridge; **Anthony Gerard Chadney**, Ipswich, both of England

[73] Assignee: **British Telecommunications Public Limited Company**, London, England

[21] Appl. No.: **607,199**

[22] Filed: **Feb. 26, 1996**

### Related U.S. Application Data

[63] Continuation of Ser. No. 271,259, Jul. 7, 1994, abandoned, which is a continuation of Ser. No. 689,923, filed as PCT/GB89/01341, Nov. 10, 1989, abandoned.

[30] **Foreign Application Priority Data**

Nov. 11, 1988 [GB] United Kingdom .................. 8826476

[51] Int. Cl.$^6$ ............................. **H04J 14/00**; H04B 10/00

[52] U.S. Cl. ......................... 359/117; 359/145; 359/172; 455/33.4; 455/54.1; 455/56.1

[58] Field of Search .............................. 359/117, 118, 359/135, 136, 145, 151, 167, 172, 152; 455/16, 53.1, 54.1, 56.1, 11.1, 33.1, 33.4; 379/56, 59

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,222,115 | 9/1980 | Cooper et al. | 375/1 |
| 4,308,429 | 12/1981 | Kai et al. | 455/33.4 |
| 4,456,793 | 6/1984 | Baker et al. | 359/152 |
| 4,468,765 | 8/1984 | Hensel et al. | 359/117 |
| 4,535,441 | 8/1985 | Schwaertzel et al. | 445/33.4 |
| 4,670,899 | 6/1987 | Brody et al. | 455/33.4 |
| 4,686,671 | 8/1987 | Buniau et al. | 455/56 |
| 4,807,222 | 2/1989 | Amitay | 359/117 |
| 4,817,204 | 3/1989 | Janselli et al. | 359/152 |
| 4,829,512 | 5/1989 | Nakai et al. | 359/117 |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0156336 | 3/1985 | European Pat. Off. . | |
| 0156336 | 10/1985 | European Pat. Off. | H04Q 7/04 |
| 0233963 | 9/1987 | European Pat. Off. . | |
| 8610195 | 9/1987 | European Pat. Off. | H04B 7/26 |
| 0391597 A3 | 10/1990 | European Pat. Off. | H04Q 7/04 |
| 0471487 A1 | 8/1991 | European Pat. Off. | H03L 7/185 |
| 0468688 A3 | 1/1992 | European Pat. Off. | H04B 7/26 |
| 3135231 | 4/1983 | Germany | H04Q 7/04 |
| 3220817A1 | 12/1993 | Germany | H04B 9/00 |
| 55-143854 | 11/1980 | Japan | H04B 7/00 |
| 55-14385 | 1/1981 | Japan | H04B 9/00 |
| 2138652 | 10/1984 | United Kingdom | |
| 8311091 | 10/1984 | United Kingdom | H04Q 11/02 |
| 2214755 | 9/1989 | United Kingdom | H04B 5/00 |

### OTHER PUBLICATIONS

*Proceedings of the IEEE*, vol. 75, No. 4, Apr. 1987, IEEE. (New York, US), D.C. Cox: "Universal Digital Portable Radio Communications," pp. 436–477.

*Patent Abstracts of Japan*, vol. 5, No. 15 (E–43)(687), 27 Jan. 1981 & JP A 55143854 (Nippon Denshind Denwa Kosha) 10 Nov. 1980.

(List continued on next page.)

*Primary Examiner*—Melvin Marcelo
*Assistant Examiner*—Rafael Bacares
*Attorney, Agent, or Firm*—Nixon & Vanderhye, P.C.

[57] **ABSTRACT**

A communications system has a base center with radio transceivers for providing a number of radio frequency (RF) communications links and a plurality of fixed radio ports through which RF signals can be transmitted and received over the air. A fiber optic network interconnects the RF transceivers and the fixed radio ports and carries the RF signals by means of optical signals. There is a plurality of radio/optical interfaces by which RF signals can be modulated onto and demodulated from one or more optical signals, between the RF transceivers and the fiber optic network, and between the fiber optic network and the fixed radio ports. A matrix switch selectively interconnects the transceivers and the radio ports through the fiber optic network.

**20 Claims, 5 Drawing Sheets**



**5,682,256**
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,829,544 | 5/1989 | Barnes et al. | 455/56 |
| 4,890,315 | 12/1989 | Bendixen et al. | 379/59 |
| 4,916,460 | 4/1990 | Powell | 359/152 |
| 5,001,757 | 3/1991 | Field et al. | 381/13 |
| 5,067,173 | 11/1991 | Gordon et al. | 359/127 |
| 5,109,532 | 4/1992 | Petrovic et al. | 455/63 |
| 5,199,062 | 3/1993 | Von Meister et al. | 379/67 |

### OTHER PUBLICATIONS

Way et al. "90–Channel FM Video Transmission to 2048 Terminals Using Two Inline Traveling–Wave Laser Amplifiers in a 1300 nm Subcarrier Multiplexed Optical System", pp. 37–39.

Fye, "Design of Fiber Optic Antenna Remoting Links for Cellular Radio Application", IEEE 1990, pp. 622–625.

Symposium Record CATV Session. Jun. 1985 note fig. 3.

Leaflet: Walmore Fibrecom, distributed by Walmore Electronics Limited, Laser House, 132–140 Goswell Road, London, England.

"Don't Scrap Your Coax Yet, But See What A Strand Of Plastic Can Do", by David McKay, Decibel Products, *Communications*.

David McKay, Moving RF Over Fiber Optics, Oct. 1988, all.

Gerd Keiser, Optical Fiber Communication, 1983, p. 8.

Donald C. Cox, Universal Digital Portable Radio Communications, Apr. 1987, p. 436–477.



*Fig1.*

## Fig.2a.



✳ DENOTES CONNECTION OF A COLUMN TO A ROW THUS COLUMN
M IS SHOWN CONNECTED TO ROWS 1, N–1 AND N

## Fig.2b.



Fig.3.



*Fig.4.*

*Fig.5a.*



*Fig.5b.*



5,682,256

1

# COMMUNICATIONS SYSTEM

This is a continuation of application Ser. No. 08/271,259, filed Jul. 7, 1994, now abandoned, which in turn is a continuation of application Ser. No. 07/689,923, filed as PCT/GB89/01341 Nov. 10, 1989, now abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a communications system, and in particular to a system for interconnecting mobile radio (RF) units to a fixed network or system e.g. PSM, ISDN, LAN or PBX.

### 2. Description of Related Art

At present, for example, in a cellular radio system mobile radio (RF) units communicate with fixed base stations which have radio transceivers that are connected to a switching control centre which is in turn coupled to the PSTN. In the proposed Telepoint system, cordless telephones (CTs) will be able to access the PSTN via radio communication with fixed base stations equiped with radio transceivers which are directly connected to the PSTN. In both these examples radio transceivers and base stations proliferate in the connection between the mobile user and the PSTN, or other network. These systems are therefore complicated and expensive. Future systems will want to provide improved coverage including the provision of many small radio "cells", and hence many base stations and radio transceivers will be required.

Difficulties in finding appropriate base station sites and the costs of equipping them may make such conventional developments impracticable; certainly they reduce the commercial attractiveness of such projects. The present invention seeks to provide a communication system of simplified structure and improved performance.

## SUMMARY OF THE INVENTION

According to a first aspect the invention provides a communications system comprising: a base centre having one or more radio transceivers for providing a number of radio frequency (RF) communications links; a plurality of fixed radio ports through which RF signals can be transmitted and received over the air; a fibre optic network for interconnecting the RF transceivers and the fixed radio ports, and for carrying the RF signals by means of optical signals; a plurality of radio/optical interfaces by which RF signals can be modulated onto and demodulated from one or more optical signals, which interfaces are between the RF transceivers and the fibre optic network, and between the fibre optic network and the fixed radio ports.

The present invention also provides a communications system comprising: a base centre having one or more radio transceivers for providing a number of radio frequency (RF) communications links; a plurality of fixed radio ports through which RF signals can be transmitted and received over the air; a fibre optic network for interconnecting the RF transceivers and the fixed radio ports, and for carrying the RF signals by means of optical signals; a plurality of radio/optical interfaces by which RF signals can be modulated onto and demodulated from one or more optical signals, which interfaces are between the RF transceivers and the fibre optic network, and between the fibre optic network and the fixed radio ports; and a matrix switch for selectively interconnecting the transceivers and the radio ports through the fibre optic network.

2

The present invention allows for centralisation of transceivers into base centres, and the consequent advantages in terms of technical and commercial gain, by having the transceivers selectively connectable through the fibre optic network to the RF ports.

The RF Communication linking may for example, be time division multiplexed (TDM) or frequency division multiplexed (FDM).

## BRIEF DESCRIPTION OF THE DRAWINGS

A preferred embodiment of the invention will now be described by way of example and with reference to the accompanying drawings, wherein:

FIG. 1 is a schematic block diagram of a communications system according to a preferred embodiment of the invention;

FIG. 2$a$ is a schematic block diagram of an optical matrix switch which can form part of the preferred embodiment;

FIG. 2$b$ is a schematic block diagram of an RF matrix switch which can form part of the preferred embodiment;

FIG. 3 is a schematic view of another embodiment of the invention.

FIG. 4 is a schematic depiction of an RF switch; and

FIGS. 5($a$) and 5($b$) are schematic diagrams of possible optical switch elements.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

The preferred embodiment illustrated in FIG. 1 is a multi-user, area coverage radio distribution system using an optical network 2.4 to link the fixed radio distribution ports 1 to a centralised radio and other signal processing base centre 10. An important feature of the system is the use of an optical carrier modulated, e.g. amplitude modulated, with a radio frequency (RF) signal.

In both the base centre 10 and RF ports 1 there are, arranged in different ways, radio/optical interfaces which can place an RF signal onto an optical carrier or conversely recover an RF signal from an optical carrier. The modulation of the optical carrier may be achieved by driving a suitable laser device with the input RF signal so that output of the laser is effectively intensity or amplitude modulated by the RF signal. With this method, a suitable optical detector receiving the amplitude modulated optical signal can produce a direct RF output. In the present specification, the term radio/optical interface is used in this context.

The radio ports 1 each have a radio/optical interface which receives and transmits radio carriers from and to roaming radio equipment. The radio carriers to be sent/received from the centralised location are placed onto/taken off an optical carrier, e.g. as described above. The optical network 2.4 linking the radio ports 1 to the base centre 10 is generally conventional, having optical links carrying RF carrier/carriers on optical carrier/carriers. Each optical link is shown as bidirectional. However, separate links could be provided for each direction. Within the optical system are optical multiplexers/demultiplexers (M+D) 4. Each multiplexer concentrates a number of optical carriers, say X, onto a fewer number of optical links than X. The demultiplexer splits a number of optical carriers onto individual optical links.

At the base centre 10 the optical system 2.4 is connected to an optical multiplexer and demultiplexer (M+D) 14. The M+D 14 is connected (illustratively) by M optical lines to an

5,682,256

3

N×M matrix switch 13, which will be described below in more detail. The N×M matrix switch 13 has N RF links to a number (N) radio transceivers 15. The radio transceivers 15 are connected through a switch 17 to a number (K) channels of another network which may be ISDN, cellular, LAN, PBX etc. K may be greater than or equal to N. Also in the base centre 10, a central unit 16 is connected to the switch 17, N×M matrix switch, and M+D 14 to control optical, RF, and baseband routing and switching, and co-ordinate the allocation of RF carriers and channels in conjunction with mobile equipment.

A central part of the base centre 10 is the N×M matrix switch 13. This multiplexes any of the N radio carriers onto any of the M optical transmission lines, i.e. none, one or more of the radio carriers may be on any one of the optical carriers at any one time. The N×M matrix switch 13 may be configured in one of two ways, as shown in FIGS. 2a and 2b. In each case, the radio/optical interface places the RF carriers to be transmitted from the central transceivers onto the optical carrier(s) and takes off, from the optical carrier (s), the RF carriers to be received by the central transceivers. The switching may be optical (FIG. 2a), in which case the radio/optical interface is on the radio "side" of the switch, or the switch may be a radio (RF) matrix switch (FIG. 2b), in which case the radio optical interface is on the optical system "side" of the switch. In either case, the overall result is that the N radio lines can be multiplexed onto the M optical lines.

The advantages of the system of the preferred embodiment are profound. A user can access the external network through any of the radio ports 1 with a suitable RF transceiver, e.g. a cordless telephone (CT), and be connected to a free one of the N transceivers 15. Provided the RF capacity was available, all N transceivers could be employed in calls to/from a particular one of the radio ports 1, or as would be more likely, the usage of the transceivers would be distributed among the radio ports of the system. Here lies a key advantage of the system: the centralisation of the radio transceivers. In the present system the radio transceivers are centralised, allowing more economic use and facilitating maintenance etc. Other significant advantages include the possibility of handover between ports covering different zones or areas, by simply switching between optical carriers, i.e. by switching within the N×M matrix switch 13. Also the use of diversity can easily be achieved centrally through switching or combining lines to 2 or more ports, to improve performance of mobiles covered by those ports. Further, advantageous use of the RF system can be achieved because any of the carriers allocated to the service, rather than a given subset, can be dynamically assigned by the centralised base, to a given zone or cell. Thus an RF carrier may be allocated to both zone 1 and zone 4, but to different users. At another time, RF carrier may be assigned to just zone 3. The total number of users may remain more or less constant for the whole system, but user density within the system may vary. For example, all the users may shift from zone 1 down to zone 4, with all the central transceivers continually active. If transceivers were placed remotely in each of the zones, the same number of transceivers as that at a central location would be required in each of the zones to meet the peak traffic demand during the day, even though they could remain idle for much of the time. Four times the number of transceivers of the centralised configuration would then be required for the system of FIG. 1, hence the improved trunking performance of the centralised scheme, minimising the cost of providing transceivers, the quantity of equipment in the field and affording a potential reduction in maintenance and installation costs.

4

Handover requires a change of base transceiver as a mobile transits zones. This need no longer be necessary as the switch, block 3, simply switches the active transceiver for a given mobile from one zone to another as the mobile makes the transition. Thus handover break is reduced to a potentially very short optical or RF switch time compared to the much longer period required to switch between transceivers.

The spectrum efficiency of many radio distribution systems are increased if the RF transmissions within the system are synchronised. This is difficult if transceivers are spread over several locations, but more straightforward when they are centralised.

An alternative embodiment the invention is shown in FIG. 3 and is very similar to that of FIG. 1, except that the optical system does not incorporate multiplexing/demultiplexing. Thus there are no M+Ds 4 and the M outputs of N×M switch 13 are connected directly to the radio ports 1. There is therefore a permanent 1 to 1 correspondence between the optical lines in the N×M switch 13 and the radio ports 1.

The embodiment of the invention described is based on the use of frequency division multiple access, where each communications link is on a separate radio frequency. As an alternative, time division multiple access could be used, where each communication link exists on separate time slots on a single radio channel. In this case there may still be multiple transceivers in the base centre 10 to cope with the traffic demand and hence provide frequency/timeslot reuse at the radio distribution ports 1. The connection from the transceivers 15 to the matrix switch 13 will then be by N radio links with P timeslots each, making N×P links in total to the matrix switch 13 from the transceivers 15. An extension of this approach is the possibility of a hybrid time and frequency division access system, with multiple radio carriers and several timeslots on each.

An example of a form of an RF switch is shown in FIG. 4. The figure shows the RF matrix switch in a three distribution point system demonstrator. The RF matrix switch interconnects the four radio transceivers 51 (with their associated isolator circuits 52) to the three circuits each of which feeds a distribution point via a pair of fibres. Bi-directional RF connections for all the combinations of base unit and D.P. are made via switches that allow either through connection or isolation of the connection path. These switches are under computer control.

The signals from/to the radio transceiver 51 are split/combined in four 3 way combiners 53 (these are acutually 4 way combiners with the spare output feeding to the scanning receiver 54) with each output/input passing through a switch that can isolate that output/input. From the switches the signals go to the inputs of one of the three 4 way combiners 55 and hence to/from the D.P.s via one of the three RF/optical interfaces 56.

These switches are under microprocessor control and allow the RF matrix to switch any transceiver to any combination of the distribution points and conversely a distribution point to any combination of the transceivers. Thus a base unit can feed all the distribution points simultaneously then by changing the switches feed only one distribution point.

Two examples of the elements for 94 optical switch are shown in FIG. 5. There are two basic technologies; (i) Bulk Optic Devices and (ii) Guided Wave Devices.

A bulk optic switch element, shogun in FIG. 5(a), uses mechanical or physical reorientation of the optical path to achieve the switching of the incoming optical signals

5,682,256

5

between output ports. An example of this type of switch is presented for a single input switchable between two outputs. Other switch configurations using this as a basic building block facilitate 2×2 and 2×4 switches.

A guided wave device switch element, shown in FIG. 5(b), uses the electro-optic effect to change the optical propagation characteristics of switch waveguides through the application of electric fields. An example of this device type is the Mach Zeader inteferometer (MZI) shown in FIG. 5(b). This type of switch can be extended from a simple 2×2 to a non-blocking 8×8 switch matrix.

We claim:

1. A communications system comprising: a base centre having a plurality of independently operated radio frequency (RF) transceivers at the base centre for providing a plurality of radio frequency (RF) communications links; a plurality of fixed radio ports through which RF signals can be transmitted and received over the air; a fibre optic network for selectively interconnecting the RF transceivers and the fixed radio ports, and for carrying the RF signals by means of optical signals; a plurality of radio/optical interfaces by which RF signals can be modulated onto and demodulated from one or more optical signals, which interfaces are between the RF transceivers and the fibre optic network, and between the fibre optic network and the fixed radio ports.

2. A communications system comprising: a base centre having a plurality of independently operated radio frequency (RF) transceivers for providing a plurality of radio frequency (RF) communications links; a plurality of fixed radio ports through which RF signals can be transmitted and received over the air; a fibre optic network for selectively interconnecting the RF transceivers and the fixed radio ports, and for carrying the RF signals by means of optical signals; a plurality of radio/optical interfaces by which RF signals can be modulated onto and demodulated from one or more optical signals, which interfaces are between the RF transceivers and the fibre optic network, and between the fibre optic network and the fixed radio ports; and a matrix switch for selectively interconnecting the transceivers and the radio ports through the fibre optic network.

3. A communications system as claimed in claim 2 wherein the RF links are frequency division multiplexed.

4. A communications system as claimed in claim 2 wherein the RF links are time division multiplexed.

5. A communications system as claimed in claim 2, wherein there is means for combining RF signals to or from one or more of the RF ports.

6. A communications system comprising: a base centre having a plurality of radio transceivers for providing a number of radio frequency (RF) communications links; a plurality of fixed radio ports through which RF signals can be transmitted and received over the air; a fibre optic network for interconnecting the RF transceivers and the fixed radio ports, and for carrying the RF signals by means of optical signals; a plurality of radio/optical interfaces by which RF signals can be modulated onto and demodulated from one or more optical signals, which interfaces are between the RF transceivers and the fibre optic network, and between the fibre optic network and the fixed radio ports; and a matrix switch for selectively interconnecting the transceivers and the radio ports through the fibre optic network;

wherein the matrix switch is for switching optical signals and between the optical matrix switch and the plurality of RF transceivers there are one or more RF/optical interfaces.

7. A communications system as claimed in claim 2 wherein the matrix switch is for switching RF signals, and

6

between the RF matrix switch and the fibre optic network there are one or more RF/optical interfaces.

8. A communications system as claimed in claim 1 wherein there is multiplexing/demultiplexing of the optical signals in the fibre optic network.

9. A communications system as claimed in claim 1 wherein the fibre optic network incorporates wavelength routing of optical signals.

10. A communication system as described in claim 1 which call handover is between radio ports is controlled in the base centre through switching the radio transceiver from one radio port to another radio port by a matrix switch.

11. A communication system as claimed in claim 10 in which diversity operation is provided by combining or switching between two or more radio points in the matrix switch.

12. A communication system as claimed in claim 1 in which dynamic channel allocation is controlled in the base centre.

13. A communications system comprising:

a base centre having a plurality of independently operated radio frequency (RF) transceivers at the base centre for establishing at least one radio frequency (RF) communication link;

a plurality of remotely located, fixedly situated, radio frequency (RF) communication points for transceiving radio frequency (RF) signals via the air;

an optical fibre network selectively connecting said base centre with each of said remote RF communication ports;

an RF/optical signal interface at said base center connected between said optical fibre network and said radio frequency transceivers for converting RF-modulated optical signals to RF electrical signals and for converting RF electrical signals to RF-modulated optical signals; and

an RF/optical signal interface at each of said RF communication ports connected to said optical fibre network for converting RF-modulated optical signals to RF electrical signals and for converting RF electrical signals to RF-modulated optical signals.

14. A cellular communications system for interfacing with plural portable or mobile RF transceivers via plural fixed RF communication ports, said system comprising:

a plurality of trunked RF communication channels including a plurality of independently operated RF transceivers accessible at a base centre location;

an optical fibre network selectively interconnecting said base centre location to said fixed RF communication ports; and

an RF/optical signal interface at both said base centre and said fixed RF communication ports for converting RF electrical signals to RF-modulated optical signals and for converting RF-modulated optical signals to RF electrical signals so that communications between the base centre and the fixed RF communication ports is via RF-modulated optical signals.

whereby RF transceiver resources may be concentrated and commonly located at the base centre for servicing a plurality of fixed RF communication ports.

15. A cellular communications system having trunked RF communication channels at a base station interfacing with plural portable or mobile RF transceivers via plural fixed RF communication ports distributed among overlapping cellular communication zones, said system comprising:

5,682,256

7

an optical fibre network selectively interconnecting said base station and its trunked RF communication channels with said fixed RF communication ports; and

an RF/optical signal interface at each end of the fibre network for converting RF electrical signals to RF-modulated optical signals and vice versa.

16. A communications system as in claim 2 wherein there is multiplexing/demultiplexing of the optical signals in the fibre optic network.

17. A communications system as in claim 2 wherein the fibre optic network incorporates wavelength routing of optical signals.

8

18. A communication system as in claim 2 wherein call handover between radio ports is controlled in the base centre through switching the radio transceiver from one radio port to another radio port by the matrix switch.

19. A communication system as in claim 2 wherein diversity operation is provided by combining or switching between two or more radio points in the matrix switching.

20. A communication system as in claim 2 wherein dynamic channel allocation is controlled in the base centre.

* * * * *

# EXHIBIT 2

Omid A. Mantashi (SBN 208226)
**Law Offices of Omid A. Mantashi**
360 Grand Avenue, Ste. 90
Oakland, California 94610
Telephone: (510) 593-9442
Facsimile: (510) 868-8310
Email: omid@california.com

Timothy L. Boller (forthcoming *pro hac vice*)
William O. Ferron, Jr. (forthcoming *pro hac vice*)
**SEED IP LAW GROUP PLLC**
701 5TH Avenue, Suite 5400
Seattle, WA 98104
Telephone: 206.622.4900
Facsimile: 206.682.6031

Email: TimB@seedip.com
       BillF@seedip.com

Attorneys for Defendant
NewPath Networks, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NextG Networks, Inc., a Delaware corporation, | No. C 08-1565 VRW |
| Plaintiff, | |
| v. | ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF DEFENDANT NEWPATH NETWORKS, LLC |
| NewPath Networks, LLC, a New Jersey limited liability corporation, | |
| Defendant. | **JURY TRIAL DEMANDED** |

Defendant NewPath Networks, LLC (hereinafter, "NewPath" or "Defendant"), by and

through its attorneys, hereby answers the Complaint filed by NextG Networks, Inc. (hereinafter,

"NextG," or "Plaintiff") as follows:

1.    Defendant admits that Plaintiff has filed a one-count Complaint alleging infringement

of a patent. Defendant denies the remaining allegations of paragraph 1.

2.      Defendant admits that this Court has jurisdiction over the asserted claims.

3.      Defendant admits that venue is proper in this Court.

4.      Defendant admits, on information and belief, that Plaintiff is a corporation existing under and by virtue of the laws of the State of Delaware and maintains a principal place of business within Santa Clara County at 2216 O'Toole Avenue, San Jose, California 95131.  On information and belief, Defendant admits that Plaintiff sells, designs and installs antenna systems.  Defendant does not know what Plaintiff means by "Distributed Antenna Systems" and "Base Station Hotels."  Thus, Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 4 of the Complaint, and on that basis denies the remaining allegations of paragraph 4 of the Complaint.

5.      Paragraph 5 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied.  Defendant admits that NewPath is a limited liability corporation existing under and by virtue of the laws of the State of New Jersey and maintains a place of business at 1300 N. Northlake Way, Seattle Washington 98103.  Defendant admits that it designs and installs antenna systems and that it markets related services.  Defendant denies that it offers to sell or sells systems.  Defendant does not know what Plaintiff means by "Distributed Antenna Systems" and "Base Station Hotels."  Thus, Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 5 of the Complaint, and on that basis denies the remaining allegations of paragraph 5 of the Complaint.

6.      Defendant admits that is has offered to provide services to customers in Contra Costa County and Alameda County.  Defendant denies that it has offered to sell systems.  Defendant notes that it does not know what Plaintiff means by "Distributed Antenna Systems" and "Base Station Hotels."  Thus, Defendant lacks sufficient information to admit or deny any remaining allegations of paragraph 6 of the Complaint, and on that basis denies any remaining allegations of paragraph 6 of the Complaint.

7.      Defendant admits that it installs antenna systems and that it markets related services.  Defendant further admits that it has distributed technical literature, specifications and responses to solicitations in California and other states.  Defendant denies that it sells or has offered to sell

2

systems.  Defendant admits that it plans to continue its activities, which Defendant contends are lawful.  Defendant denies that it has "threatened" to do anything. Defendant does not know what Plaintiff means by "Distributed Antenna Systems," "Base Station Hotels" and "Requests for Proposals."  Thus, Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 7 of the Complaint, and on that basis denies the remaining allegations of paragraph 7 of the Complaint.

8.      Defendant admits that it installs antenna systems and that it markets related services. Defendant further admits that it has had communications with customers and potential customers for its services in California and other states.  Defendant denies that it sells or has offered to sell systems.  Defendant admits that it plans to continue its activities, which Defendant contends are lawful.  Defendant denies that it has "threatened" to do anything.  Defendant does not know what Plaintiff means by "Distributed Antenna Systems" and "Base Station Hotels."  Further, "numerous," as used by Plaintiff in paragraph 8, is vague.  Thus, Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 8 of the Complaint, and on that basis denies the remaining allegations of paragraph 8 of the Complaint.

9.      Defendant admits that it installs antenna systems and that it markets related services, including services using antenna systems, in California and other states.  Defendant denies that it sells or engages in efforts to sell systems.  Defendant does not know what Plaintiff means by "Distributed Antenna Systems" and "Base Station Hotels."  Thus, Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 9 of the Complaint, and on that basis denies the remaining allegations of paragraph 9 of the Complaint.

10.      In response to paragraph 10 of the Complaint, Defendant incorporates its answers to paragraphs 1 through 9 of this Answer as if fully set forth herein.

11.      Paragraph 11 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied.  On information and belief, Defendant admits that U.S. Patent No. 5,682,256 ("the '256 Patent") was issued to Andrew James Motley and Anthony Gerard Chadney on or about October 28, 1997, and that Exhibit A to the Complaint appears to be a correct

copy of the '256 Patent. Defendant denies the remaining allegations of paragraph 11 of the Complaint.

12. Paragraph 12 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied. Defendant lacks sufficient information to admit or deny remaining the allegations of paragraph 12 of the Complaint, and on that basis denies the remaining allegations of paragraph 12 of the Complaint.

13. Paragraph 13 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied. Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 13 of the Complaint, and on that basis denies the remaining allegations of paragraph 13 of the Complaint.

14. Paragraph 14 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied. Defendant lacks sufficient information to admit or deny the remaining allegations of paragraph 14 of the Complaint, and on that basis denies the remaining allegations of paragraph 14 of the Complaint.

15. Paragraph 15 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied. Defendant admits that it installs and uses antenna systems and that it markets related services. Defendant uses off-the-shelf components in its antenna systems. Defendant denies that it sells or offers to sell systems. Defendant denies that any of its activities infringe any valid claim of the '256 Patent. Defendant does not know what Plaintiff means by "Distributed Antenna Systems" and "Base Station Hotels." Further, "making" as used by Plaintiff in paragraph 15 of the Complaint is vague. Thus, Defendant lacks sufficient information to admit or deny any remaining allegations of paragraph 15 of the Complaint, and on that basis denies any remaining allegations of paragraph 15 of the Complaint.

16. Paragraph 16 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied. Defendant admits that it installs and uses antenna systems and that it markets related services. Defendant denies that it sells or offers to sell systems. Defendant denies that any of its activities contribute to the direct infringement of any valid claim of the '256 Patent by another. Defendant does not know what Plaintiff means by "Distributed Antenna

Systems" and "Base Station Hotels."  Thus, Defendant lacks sufficient information to admit or deny any remaining allegations of paragraph 16 of the Complaint, and on that basis denies any remaining allegations of paragraph 16 of the Complaint.

17.    Paragraph 17 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied.  Defendant denies that any of its activities infringe any valid claim of the '256 Patent, and denies that Plaintiff has suffered or will suffer any damages as a result of any activities by Defendant.  Defendant denies any remaining allegations of paragraph 17 of the Complaint.

18.    Paragraph 18 of the Complaint contains legal contentions, to which no response is required, and which are therefore denied.  Defendant denies that any of its activities infringe any valid claim of the '256 Patent, and denies that Plaintiff has suffered or will suffer any damages as a result of any activities by Defendant.  Defendant denies any remaining allegations of paragraph 18 of the Complaint.

19.    Answering Plaintiff's prayer for relief, Defendant denies that Plaintiff is entitled to any relief and denies the allegations contained within Plaintiff's prayer for relief.

## DEFENDANT'S FACTUAL ALLEGATIONS

In further reply to Plaintiff's claims, and in support of Defendant's Affirmative Defenses thereto and Counterclaims, Defendant alleges as follows:

## INTRODUCTION

1.    Through its counterclaims, Counterclaimant NewPath seeks redress for Plaintiff's knowing misuse of the '256 Patent.  Plaintiff NextG has wrongfully asserted and threatened to assert patent infringement without regard to whether any of NewPath's systems infringe any valid and enforceable claim of the '256 Patent.  Specifically, Plaintiff brought the present lawsuit with knowledge that the claims of the '256 Patent cannot be construed so as to cover any of NewPath's antenna systems, and for the improper purpose of interfering with NewPath's business and NewPath's existing and potential business relationships.

5

2.   Accordingly, and as set forth in more detail below, NewPath seeks damages, costs and attorney's fees, and preliminary and permanent injunctive relief.  In addition, NewPath asks this Court to declare the '256 Patent invalid, unenforceable and not infringed.

## JURISDICTION AND VENUE

3.   This Court has original jurisdiction over the subject matter of these counterclaims pursuant to 28 U.S.C. §§ 1331 (Federal Question), 1338(a) (Patents), and 28 U.S.C. §§ 2201(a) (Declaratory Judgment), and over the other claims set forth below by virtue of 28 U.S.C. § 1338(b) and pendant jurisdiction.

4.   Venue is proper pursuant to 28 U.S.C. §§ 1391(a) and 1391(b).

## THE PARTIES

5.   Defendant NewPath Networks, LLC, is a New Jersey limited liability corporation with a place of business located at 1300 N. Northlake Way, Seattle Washington 98103.

6.   On information and belief, Plaintiff NextG Networks, Inc. is a Delaware corporation with a principal place of business within Santa Clara County at 2216 O'Toole Avenue, San Jose, California 95131.

## PERTINENT FACTS

7.   NewPath and Plaintiff are competitors in the field of providing services related to antenna systems.

8.   Plaintiff has known for several years that NewPath is a competitor of Plaintiff.

9.   On information and belief, Plaintiff has known for several years the specific equipment NewPath installs in its antenna systems.

10.   In the Complaint, Plaintiff does not identify any specific equipment upon which Plaintiff bases the allegations of infringement contained therein.

11.   On April 11, 2008 and April 14, 2008, NewPath asked Plaintiff's counsel to identify the equipment used in the NewPath antenna systems that Plaintiff accused of infringement.

6

12.     To date, Plaintiff has not identified any specific equipment Plaintiff accuses of infringing the '256 Patent.

13.     Most of NewPath's antenna systems are digital, and do not transmit even a single radio frequency ("RF") signal on an optical network.

14.     On information and belief, when it filed the Complaint, Plaintiff was aware that most of NewPath's antenna systems are digital, and do not transmit even a single RF signal on an optical network.

15.     Plaintiff is currently aware that most of NewPath's systems are digital, and do not transmit even a single RF signal on an optical network.

16.     None of NewPath's systems are configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

17.     On information and belief, when it filed the Complaint, Plaintiff was aware that none of NewPath's systems are configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

18.     Plaintiff is currently aware that none of NewPath's systems are configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

19.     All of NewPath's antenna systems provide the same signal to all repeater antennas coupled to an optical network.

20.     On information and belief, when it filed the Complaint, Plaintiff was aware that all of NewPath's antenna systems provide the same signal to all repeater antennas coupled to an optical network.

21.     Plaintiff is currently aware that all of NewPath's antenna systems provide the same signal to all repeater antennas coupled to an optical network.

22.     None of NewPath's antenna systems had or has a matrix switch.

23.     On information and belief, when it filed the Complaint, Plaintiff was aware that none of NewPath's antenna systems had or has a matrix switch.

ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS                                                    CASE NO. C 08-1565 VRW

24.     Plaintiff is currently aware that none of NewPath's systems had or has a matrix switch.

25.     NewPath obtains the optical signal equipment used in its antenna systems from only three equipment suppliers: ADC Telecommunications Sales, Inc. ("ADC"), Andrew Corporation ("Andrew"), and Powerwave Technologies, Inc. ("Powerwave").

26.     NewPath obtains off-the-shelf equipment from ADC that is installed in most of its antenna systems ("the ADC Equipment"), and has used this ADC Equipment for several years.

27.     On information and belief, Plaintiff uses the same ADC Equipment in some of its antenna systems, and has used this ADC Equipment for several years.

28.     On information and belief, when it filed the Complaint, Plaintiff was familiar with the characteristics of the ADC Equipment.

29.     Plaintiff is currently aware of the characteristics of the ADC Equipment.

30.     The ADC Equipment is not configured to transmit radio frequency ("RF") signals on an optical network.

31.     The ADC Equipment cannot be configured to transmit RF signals on an optical network without substantial and expensive modification.

32.     On information and belief, when it filed the Complaint, Plaintiff was aware that the ADC Equipment used by NewPath had not been modified to transmit RF signals on an optical network.

33.     There is no motivation for NewPath to modify the ADC equipment to transmit RF signals on an optical network.

34.     On information and belief, when it filed the Complaint, Plaintiff was aware that NewPath would have had no motivation to modify the ADC Equipment to transmit RF signals on an optical network.

35.     The ADC Equipment is not configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

36.     The ADC Equipment cannot be configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network without substantial and expensive modification.

37.     On information and belief, when it filed the Complaint, Plaintiff was aware that the ADC Equipment used by NewPath had not been modified to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

38.     There is no motivation for NewPath to modify the ADC Equipment to selectively interconnect a plurality of RF signals with a plurality of radio ports via an optical network.

39.     On information and belief, when it filed the Complaint, Plaintiff was aware that NewPath would have had no motivation to modify the ADC Equipment to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

40.     On information and belief, when it filed the Complaint, Plaintiff was aware that the ADC Equipment used by NewPath does not have a matrix switch.

41.     Plaintiff is currently aware that the ADC Equipment used by NewPath does not have a matrix switch.

42.     There is no motivation for NewPath to modify the ADC Equipment to incorporate a matrix switch.

43.     On information and belief, when it filed the Complaint, Plaintiff was aware that NewPath would have had no motivation to modify the ADC Equipment to incorporate a matrix switch.

44.     NewPath obtains off-the-shelf equipment from Andrew that is installed in some of its antenna systems ("the Andrew Equipment"), and has used this Andrew Equipment for several years.

45.     On information and belief, Plaintiff uses the same Andrew Equipment in most of its antenna systems, and has used this Andrew Equipment for several years.

46.     On information and belief, when it filed the Complaint, Plaintiff was familiar with the characteristics of the Andrew Equipment.

47.     Plaintiff is currently aware of the characteristics of the Andrew Equipment.

9

48.     The Andrew Equipment is not configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

49.     The Andrew Equipment cannot be configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network without substantial and expensive modification.

50.     On information and belief, when it filed the Complaint, Plaintiff was aware that the Andrew Equipment used by NewPath had not been modified to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

51.     There is no motivation for NewPath to modify the Andrew Equipment to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

52.     On information and belief, when it filed the Complaint, Plaintiff was aware that NewPath would have had no motivation to modify the Andrew Equipment to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

53.     On information and belief, when it filed the Complaint, Plaintiff was aware that the Andrew Equipment used by NewPath does not have a matrix switch.

54.     Plaintiff is currently aware that the Andrew Equipment used by NewPath does not have a matrix switch.

55.     There is no motivation for NewPath to modify the Andrew Equipment to incorporate a matrix switch.

56.     On information and belief, when it filed the Complaint, Plaintiff was aware that NewPath would have had no motivation to modify the Andrew Equipment to incorporate a matrix switch.

57.     NewPath obtains off-the-shelf equipment from Powerwave that is installed in some of its antenna systems ("the Powerwave Equipment").

58.     On information and belief, Plaintiff uses the same Powerwave Equipment in some of its antenna systems, and has used this Powerwave Equipment for several years.

59.     On information and belief, when it filed the Complaint, Plaintiff was familiar with the characteristics of the Powerwave Equipment.

10

ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS                                          CASE NO. C 08-1565 VRW

60.     Plaintiff is currently aware of the characteristics of the Powerwave Equipment.

61.     The Powerwave Equipment is not configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

62.     The Powerwave Equipment cannot be configured to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network without substantial and expensive modification.

63.     On information and belief, when it filed the Complaint, Plaintiff was aware that the Powerwave Equipment used by NewPath had not been modified to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

64.     There is no motivation for NewPath to modify the Powerwave Equipment to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

65.     On information and belief, when it filed the Complaint, Plaintiff was aware that NewPath would have had no motivation to modify the Powerwave Equipment to selectively interconnect a plurality of received RF signals with a plurality of radio ports via an optical network.

66.     On information and belief, when it filed the Complaint, Plaintiff was aware that the Powerwave Equipment used by NewPath does not have a matrix switch.

67.     Plaintiff is currently aware that the Powerwave Equipment used by NewPath does not have a matrix switch.

68.     There is no motivation for NewPath to modify the Powerwave Equipment to incorporate a matrix switch.

69.     On information and belief, when it filed the Complaint, Plaintiff was aware that NewPath would have had no motivation to modify the Powerwave Equipment to incorporate a matrix switch.

70.     On information and belief, when it filed the Complaint, Plaintiff was aware of the content of the applications that matured into the '256 Patent.

71.     On information and belief, when it filed the Complaint, Plaintiff was aware of the content of the public prosecution history of the applications that matured into the '256 Patent.

11

72.     On information and belief, when it filed the Complaint, Plaintiff was aware of the claims of the '256 Patent as issued.

73.     The claims of the '256 Patent as issued do not recite "Distributed Antenna Systems."

74.     The claims of the '256 Patent as issued do not recite "Base Station Hotels."

75.     On information and belief, before filing the Complaint, Plaintiff was aware of the content of European Patent Application No. EP 93 30 6447, and the inventor(s) thereof.

76.     Plaintiff's predecessors-in-interest were aware of the content of European Patent Application No. EP 93 30 6447 during prosecution of the applications which matured into the '256 Patent.

77.     European Patent Application No. EP 93 30 6447 was not disclosed to the U.S. Patent and Trademark Office during prosecution of the applications which matured into the '256 Patent.

78.     On information and belief, when it filed the Complaint, Plaintiff was aware of the reason why European Patent Application No. EP 93 30 6447 was allowed to go abandoned.

79.     On information and belief, when it filed the Complaint, Plaintiff was aware of the content of an amendment mailed on or about September 14, 1995.

80.     On information and belief, when it filed the Complaint, Plaintiff was aware of the content of page 7 of the amendment mailed on or about September 14, 1995.

81.     In the amendment mailed on or about September 14, 1995, the putative inventors' representative amended the independent claims 1, 2, 13 and 14 to recite "a plurality" of RF transceivers.  The representative rewrote dependent claim 6 as an independent claim that recites "a plurality" of radio transceivers.

82.     In the amendment mailed on or about September 14, 1995, the putative inventors' representative distinguished systems comprising multiple independent networks from the claimed invention, which "involves interconnecting all transceivers and ports."

83.     In the amendment mailed on or about September 14, 1995, the putative inventors' representative distinguished baseband switching from "switching [that] takes place between the transceivers and radio ports."

ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS                                                    CASE NO. C 08-1565 VRW

84.     On information and belief, when it filed the Complaint, Plaintiff was aware of the content of an amendment mailed on or about January 29, 1996.

85.     In the amendment mailed on or about January 29, 1996, the putative inventors' representative amended independent claims 1, 2, 13 and 14 to recite a plurality of "independently operated" RF tranceivers, and amended independent claims 1, 2, 13, 14 and 15 to recite that the fiber optic network "selectively" interconnects the RF transceivers and fixed radio ports.

86.     In the amendment mailed on or about January 29, 1996, the putative inventors' representative stated (emphasis added):

> All that Powell shows is two networks, each having a single RF transceiver permanently connected to a number of antenna sites. . . .
>
> The Examiner hypothesizes that Powell's system could be extended by having a plurality of transceivers interconnected with the antenna sites.  However, there is no suggestion in the prior art that this might be done.  It is noted in particular that in Powell's branched network *all the antenna sites are necessarily transmitting/receiving the same signals*, since they are being used to enlarge the size of a single cell. There is no need for more than one transceiver to be connected to them.  Simply pluralizing Powell's system would simply produce several topologically separate branched networks, each having a single transceiver. Alternatively, *adding a second transceiver to a single branched network of the Powell type, as the Examiner suggests, would not achieve a useful result as each antenna would transmit the output of all the transceivers.*

87.     In the amendment mailed on or about January 29, 1996, the putative inventors' representative further stated:

> In contrast [to a combination of the cited references], the present invention consist of migrating all the RF transceivers to a central station, and selectively interconnecting the radio ports (antenna sites) with the transceivers, by means of an optical fibre network.

88.     All of NewPath's outdoor antenna systems receive a single RF signal for a single cell.

89.     On information and belief, when it filed the Complaint, Plaintiff was aware that all of NewPath's outdoor systems receive a single RF signal for a single cell.

90.     Only one of NewPath's systems receives more than one RF signal, and in that system all of the antennas transmit all of the RF signals.

91.     Plaintiff filed the Complaint shortly after losing to NewPath in a competitive bid process for a substantial contract to provide antenna system related services.

13

92.   Plaintiff filed the Complaint within days before the industry's largest annual meeting.

93.   On information and belief, when it filed the Complaint, Plaintiff knew that the ADC Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the ADC Equipment is digital.

94.   Plaintiff is currently aware that the ADC Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the ADC Equipment is digital.

95.   On information and belief, when it filed the Complaint, Plaintiff knew that the ADC Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the ADC Equipment does not selectively interconnect a plurality of independent RF signals with a plurality of fixed radio ports via an optical network.

96.   Plaintiff is currently aware that the ADC Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the ADC Equipment does not selectively interconnect a plurality of independent RF signals with a plurality of fixed radio ports via an optical network.

97.   On information and belief, when it filed the Complaint, Plaintiff knew that the ADC Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the ADC Equipment does not have a matrix switch.

98.   Plaintiff is currently aware that the ADC Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the ADC Equipment does not have a matrix switch.

99.   On information and belief, when it filed the Complaint, Plaintiff knew that the Andrew Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Andrew Equipment does not selectively interconnect a plurality of independent RF signals with a plurality of fixed radio ports via an optical network.

100.   Plaintiff is currently aware that the Andrew Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Andrew Equipment does not selectively interconnect a plurality of independent RF signals with a plurality of fixed radio ports via an optical network.

14

101.    On information and belief, when it filed the Complaint, Plaintiff knew that the Andrew Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Andrew Equipment does not have a matrix switch.

102.    Plaintiff is currently aware that the Andrew Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Andrew Equipment does not have a matrix switch.

103.    On information and belief, when it filed the Complaint, Plaintiff knew that the Powerwave Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Powerwave Equipment does not selectively interconnect a plurality of independent RF signals with a plurality of fixed radio ports via an optical network.

104.    Plaintiff is currently aware that the Powerwave Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Powerwave Equipment does not selectively interconnect a plurality of independent RF signals with a plurality of fixed radio ports via an optical network.

105.    On information and belief, when it filed the Complaint, Plaintiff knew that the Powerwave Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Powerwave Equipment does not have a matrix switch.

106.    Plaintiff is currently aware that the Powerwave Equipment used by NewPath did not and does not infringe any claim of the '256 Patent at least because the Powerwave Equipment does not have a matrix switch.

107.    On information and belief, Plaintiff's infringement claims are brought in bad faith with knowledge that Defendant has not and does not infringe any valid rights of Plaintiff in the '256 Patent.

108.    On information and belief, Plaintiff's claims are brought in bad faith with knowledge that the '256 Patent is invalid and/or unenforceable.

109.    Plaintiff's infringement claims are objectively baseless and brought in bad faith.

110.    Plaintiff's infringement claims were brought with an intent to interfere with NewPath's existing and potential business relationships.

111.   NewPath had a supplier agreement with Andrew, and continuation of that supplier agreement would have benefited NewPath.

112.   When it filed the Complaint, Plaintiff was, on information and belief, aware of NewPath's business relationship with Andrew.

113.   Plaintiff knew its objectively baseless infringement allegations were likely to disrupt NewPath's relationship with Andrew.

114.   Andrew terminated a business relationship with NewPath.

115.   On information and belief, Andrew terminated the business relationship with NewPath because of Plaintiff's objectively baseless allegations of infringement of the '256 Patent.

116.   Plaintiff's requests for preliminary and permanent injunctive relief are objectively baseless, particularly in view of NewPath's non-infringement, Plaintiff's long knowledge of NewPath's existence, and the short amount of patent term remaining for the '256 Patent.

117.   On information and belief, Plaintiff filed the present action either without conducting an adequate pre-filing investigation into its allegations of infringement, or with knowledge that its infringement allegations were objectively baseless.

118.   Defendant reserves the right to add affirmative defenses and claims or to institute additional actions as additional facts are obtained through discovery.

## **AFFIRMATIVE DEFENSES**

In further reply to Plaintiff's claims, and as affirmative defenses thereto, Defendant incorporates Defendant's Factual Allegations as set forth above and further alleges as follows:

119.   Plaintiff's claims are barred in whole or in part by:

a.   the statute of limitations; or

b.   the doctrines and principles of waiver, estoppel, unclean hands, inequitable conduct and laches.

120.   The Complaint fails to state a claim upon which relief may be granted.

121.   Defendant did not infringe, has not infringed and is not infringing any valid claim of the '256 Patent, either directly or under the doctrine of equivalents.

16

122.    The '256 Patent is, on information and belief, invalid for failure to satisfy the requirements for patentability of one or more of the sections of the Patent Act, Title 35, United States Code (hereinafter "35 U.S.C.").

123.    The '256 Patent is, on information and belief, invalid for failing to meet the written description and/or enablement requirements under 35 U.S.C. § 112.

124.    The '256 Patent is, on information and belief, invalid for failing to meet the best mode requirement under 35 U.S.C. § 112.

125.    The '256 Patent is, on information and belief, invalid for failing to meet the definiteness requirement under 35 U.S.C. § 112.

126.    The '256 Patent is, on information and belief, invalid for failure to meet the conditions of patentability of one or more of the subsections of 35 U.S.C. § 102.

127.    The '256 Patent is, on information and belief, invalid under 35 U.S.C. § 102 because the alleged inventors did not invent the subject matter sought to be patented in the '256 Patent.

128.    The '256 Patent is, on information and belief, invalid for failure to meet the conditions of patentability of one or more of the subsections of 35 U.S.C. § 103.

129.    The '256 Patent is, on information and belief, unenforceable because Plaintiff, whether alone or acting in concert with others, has knowingly misused the '256 Patent by asserting and threatening to assert patent infringement without regard to whether the accused systems infringe any valid and enforceable claim of the '256 Patent, and by wrongfully seeking to extend the '256 Patent beyond its lawful scope.  Plaintiff's misuse and its effects continue.

130.    Plaintiff has failed to mitigate any alleged damages.

131.    Defendant acted innocently and in good faith.

132.    The prior art so limits and restricts the scope of the '256 Patent claims that Defendant cannot be considered to have infringed Plaintiff's rights.

133.    Plaintiff is not entitled to injunctive relief because any alleged injury to Plaintiff is neither immediate nor irreparable, and adequate remedies at law are available to Plaintiff.

134.    Plaintiff is estopped from construing any claim of the '256 Patent to cover or include, either literally or by application of the Doctrine of Equivalents, any product made, used, imported,

17

sold, or distributed by the Defendant, as a result of acts, representations, admissions, or omissions made during the prosecution of the patent application that matured into the '256 Patent.

135.    On information and belief, Plaintiff filed another infringement action against another competitor raising similar objectively baseless allegations of infringement of the '256 Patent.

## COUNTERCLAIMS

Defendant NewPath Networks, LLC, incorporates Defendant's Factual Allegations and Affirmative Defenses as set forth above, and asserts the following counterclaims against Plaintiff NextG Networks, Inc.

## COUNT I
## DECLARATORY JUDGMENT OF PATENT INVALIDITY

136.    Defendant incorporates by reference each of the averments contained in the foregoing paragraphs as though fully set forth herein.

137.    An actual controversy exists between Plaintiff and Defendant regarding the validity of the claims of the '256 Patent.

138.    Defendant therefore requests a Declaratory Judgment that the claims of the '256 Patent are invalid.

## COUNT II
## DECLARATORY JUDGMENT OF NON-INFRINGEMENT

139.    Defendant incorporates by reference each of the averments contained in the foregoing paragraphs as though fully set forth herein.

140.    An actual controversy exists between Plaintiff and Defendant regarding whether any valid claim of the '256 Patent is infringed by Defendant.

141.    Defendant therefore requests a Declaratory Judgment that Defendant does not infringe any valid claim of the '256 Patent.

18

## COUNT III

## DECLARATORY JUDGMENT OF UNENFORCEABILITY

142.    Defendant incorporates by reference each of the averments contained in the foregoing paragraphs as though fully set forth herein.

143.    An actual controversy exists between Plaintiff and Defendant regarding whether Plaintiff has misused and is misusing the '256 Patent.

144.    Defendant therefore requests a Declaratory Judgment that the '256 Patent is unenforceable.

## COUNT IV

## TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP IN VIOLATION OF WASHINGTON LAW

145.    Defendant incorporates by reference each of the averments contained in the foregoing paragraphs as though fully set forth herein.

146.    On information and belief, Plaintiff has publicly threatened litigation against NewPath and filed the present action without an objective basis therefore against NewPath in bad faith and for the improper purpose of interfering with the business relationships of a competitor.

147.    Plaintiff's actions complained of herein constitute tortiuous interference with a contractual relationship in violation of Washington law.

148.    Plaintiff's actions have damaged, and will continue to damage, Defendant's market share, reputation, and goodwill, and have discouraged and may discourage current and potential customers and vendors from dealing with Defendant.  Such irreparable harm will continue unless Plaintiff's acts are restrained and/or enjoined.

149.    Defendant has been damaged by Plaintiff's actions in an amount to be proven at trial.

19

## COUNT V

## NEGLIGENT INTERFERENCE WITH A BUSINESS EXPECTANCY IN VIOLATION OF CALIFORNIA LAW

150. Defendant incorporates by reference each of the averments contained in the foregoing paragraphs as though fully set forth herein.

151. On information and belief, Plaintiff has publicly threatened litigation against NewPath and filed the present action without an objective basis therefore against NewPath in bad faith and for the improper purpose of interfering with the business relationships of its competitor, NewPath.

152. NewPath and Andrew had an economic relationship.

153. Plaintiff knew, or should have known, that NewPath and Andrew had an economic relationship, and that this economic relationship probably would have resulted in a future economic benefit to NewPath.

154. Plaintiff knew, or should have known, that NewPath's relationship with Andrew would be disrupted if Plaintiff failed to act with reasonable care.

155. Plaintiff knew, or should have known, that the actions complained of herein were likely to disrupt NewPath's economic relationship with Andrew.

156. Plaintiff failed to act with reasonable care, and engaged in wrongful conduct when it asserted objectively baseless infringement allegations against NewPath.

157. Plaintiff engaged in further wrongful conduct through its patent misuse.

158. Plaintiff's wrongful conduct complained of herein was a substantial factor in causing Andrew to terminate, or otherwise disrupt the economic relationship with NewPath.

159. Plaintiff's actions have damaged, and will continue to damage, Defendant's market share, reputation, and goodwill, and have discouraged and may discourage current and potential customers and vendors from dealing with Defendant. Such irreparable harm will continue unless Plaintiff's acts are restrained and/or enjoined.

160. Defendant has been damaged by Plaintiff's actions in an amount to be proven at trial.

20

**COUNT VI**

**UNFAIR BUSINESS COMPETITION IN VIOLATION OF CALIFORNIA LAW**

**(BUSINESS AND PROFESSIONS CODE § 17200 *ET SEQ.*)**

161.   Defendant incorporates by reference each of the averments contained in the foregoing paragraphs as though fully set forth herein.

162.   Plaintiff has engaged, and continues to engage, in unlawful, unfair, fraudulent, untrue, and business practices likely to deceive members of the general public and the competition, and harm Defendant, through the wrongful conduct complained of herein, including acts of patent misuse, misrepresentation of NewPath as a patent infringer, and tortiuous interference.

163.   By engaging in the wrongful conduct complained of herein, Plaintiff has committed one or more acts of unfair competition with the meaning of California Business & Professions Code § 17200, *et seq.*

164.   Plaintiff's actions have damaged, and will continue to damage, Defendant's market share, reputation, and goodwill, and have discouraged and may discourage current and potential customers and vendors from dealing with Defendant.

165.   Defendant will continue to be damaged unless Plaintiff is enjoined from continuing to engage in the unlawful, unfair, fraudulent, untrue, and deceptive business practices complained of herein.  Such irreparable harm will continue unless Plaintiff's acts are restrained and/or enjoined.

166.   Defendant has been damaged by Plaintiff's actions in an amount to be proven at trial.

167.   So as not to be unjustly enriched by its own wrongful conduct, Plaintiff should be required to provide restitution and disgorge all monies wrongfully obtained by Plaintiff as a result of its unfair competition as complained of herein.

**PRAYER FOR RELIEF**

WHEREFORE, Defendant NewPath Networks, LLC prays for relief and judgment as follows:

1.     That the Complaint be dismissed with prejudice.

21

ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS

CASE NO. C 08-1565 VRW

2.      That the Court declare that the '256 Patent is invalid.

3.      That the Court declare that Defendant did not, does not and has not infringed, directly, contributorily, or by inducement, any valid and enforceable claim of the '256 Patent.

4.      That the Court declare that the '256 Patent is unenforceable.

5.      That Plaintiff, its respective officers, agents, servants, employees, and attorneys, and all others in active concert or participation with Plaintiff, and each of them, be preliminarily and permanently enjoined and restrained from:

      a.      From making any claims to any person or entity that NewPath's systems and related services infringe the '256 Patent;

      b.      From interfering with, or threatening to interfere with, the installation or use of antenna systems by NewPath, its allied parties, suppliers, distributors, customers, licensees, successors or assigns, and others;

      c.      From instituting or prosecuting any lawsuit or proceeding, placing in issue the right of NewPath, its allied parties, suppliers, distributors, customers, licensees, successors or assigns, and others to install, use, or sell antenna systems and related services.

6.      That Plaintiff be required to pay Defendant such damages as Defendant has sustained, or will sustain, in consequence of Plaintiff's tortious and negligent interference and unfair competition, and to account for all gains, profits, and advantages derived by Plaintiff that are attributable to such unlawful acts, and that such damages be enhanced as permitted by law.

7.      That this Court award Defendant its reasonable attorneys' fees and costs of suit herein.

8.      That this Court grant prejudgment and post judgment interest to Defendant.

9.      That this Court grant Defendant such other and further relief as the Court deems appropriate.

///

///

ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS                                                    CASE NO. C 08-1565 VRW

DATED this 15th day of May, 2008

Respectfully submitted,

/s/Omid A. Mantashi

_____
Omid A. Mantashi (SBN 208226)
Law Offices of Omid A. Mantashi
360 Grand Avenue, Ste. 90
Oakland, California  94610
Telephone:  (510) 593-9442

Timothy L. Boller, WSBA # 29079
SEED IP Law Group, PLLC
701 Fifth Avenue, Suite 5400
Seattle, Washington  98104
Telephone:  (206) 622-4900

Attorneys for Defendant
NEWPATH NETWORKS, LLC

23

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. Proc. 38(b), Defendant and Counterclaim Plaintiff NewPath

Networks, LLC, hereby demands a trial by jury on all issues so triable.

Dated: May 15, 2008

Respectfully submitted,

/s/Omid A. Mantashi

_____

Omid A. Mantashi (SBN 208226)
Law Offices of Omid A. Mantashi
360 Grand Avenue, Ste. 90
Oakland, California  94610
Telephone:  (510) 593-9442

Timothy L. Boller, WSBA # 29079
SEED IP Law Group, PLLC
701 Fifth Avenue, Suite 5400
Seattle, Washington  98104
Telephone:  (206) 622-4900

Attorneys for Defendant
NEWPATH NETWORKS, LLC

1166879_2.DOC

ANSWER, AFFIRMATIVE DEFENSES, AND
COUNTERCLAIMS

CASE NO. C 08-1565 VRW

**EXHIBIT 3**

**RESULT LIST**
**0** results found in the Worldwide database for:
**EP93306447** as the publication, application, priority or NPL reference number
(Results are sorted by date of upload in database)

_____

Data supplied from the **_esp@cenet_** database - Worldwide

**EXHIBIT 4**



(19) Europäisches Patentamt
European Patent Office
Office européen des brevets



(11)     **EP 0 869 661 A1**

(12)     **EUROPEAN PATENT APPLICATION**

(43) Date of publication:
**07.10.1998 Bulletin 1998/41**

(51) Int. Cl.$^6$: **H04N 1/40**, H04N 1/191

(21) Application number: 98201699.0

(22) Date of filing: **16.08.1993**

(84) Designated Contracting States:
**DE FR GB IT**

(30) Priority: **21.08.1992 JP 222713/92**

(62) Document number(s) of the earlier application(s) in accordance with Art. 76 EPC:
**93306446.1 / 0 585 028**

(71) Applicant:
**CANON KABUSHIKI KAISHA**
**Tokyo (JP)**

(72) Inventors:
• **Otsubo, Toshihiko**
Tokyo (JP)

• **Matsuda, Yuji**
Tokyo (JP)

(74) Representative:
**Beresford, Keith Denis Lewis et al**
**BERESFORD & Co.**
**2-5 Warwick Court**
**High Holborn**
**London WC1R 5DJ (GB)**

Remarks:
This application was filed on 20 - 05 - 1998 as a divisional application to the application mentioned under INID code 62.

(54)     **Image processing apparatus and method**

(57)     An image processing apparatus for recording a read image upon a recording medium. If a reading width of an image reading sensor is wider than a recording width of a recording head, the apparatus controls scanning of the image sensor and the recording head. The recording head comprises uniformly aligned recording elements divided into a plurality of groups. Image data read by the image sensor is stored into a memory, then used for activating the recording elements of the recording head. The apparatus conveys a recording medium by a length corresponding to one recording element group at each scanning of the recording head. If the amount of meaningless data or recorded data of the stored data corresponds to the amount of one scanning of the recording head or more, the image sensor performs the next reading.

F I G. 1



EP 0 869 661 A1

**Description**

BACKGROUND OF THE INVENTION

Present invention relates to an image processing apparatus and method for inputting an original image and copying the input image on a predetermined recording medium.

As an image processing apparatus of this type, an apparatus using the ink-jet method as its image recording mechanism has been provided.

Generally, binary image recording comprises steps of determining the status of a dot "black or white", which means discharging/not-discharging an ink, and representing a whole image with a mass of such black/white dots. Recent improvements in this technique have enabled half-tone image recording.

Various printing methods have been introduced as multi-level (half tone, gray-scale) image printing methods, e.g., the error diffusion method and the dither method. These methods basically use a plurality of minute pixels for representing one printing pixel. To form a gradation image, the number of minute pixels is changed to vary the area of one printing pixel.

One printing pixel is formed by repeating printing processing plural times. In contrast to the method for printing one printing pixel by one of two status (binary image printing method), the number of density levels of the multi-level printing increases in accordance with the number of printing processings, which attains subtle gradation expression.

Further, in order to improve printing speed in the multi-level image printing method, a multi-nozzle construction, i.e., the construction of a printing head comprising a plurality of nozzles (discharging elements, discharging portions) is employed.

In this case, small difference in ink discharge amount (volume) between the nozzles and difference in shape of nozzles cause density difference between the nozzles. To reduce unevenness in density derived from this density difference, diffusing the density difference has been considered. The technique makes the density unevenness visually inconspicuous and forms an excellent image. Detailed description of the technique will be given below with reference to Fig. 12 which shows the relation between a multi-nozzle head (here the number of the nozzles is thirty) and pixels to be recorded.

In Fig. 12, the printing head is divided into three parts A to C. One printing pixel is represented by a density value 0 to 3 (four-level value) which is attained by actually discharging of zero to three ink drops.

Upon recording, nozzles 1 to 10 perform a first stage of image recording; nozzles 11 to 20, a second stage of recording which is overstrike (overlap) printing on the first recorded image; and nozzles 21 to 30, a third stage of recording which is overstrike printing on the second recorded image. It should be noted that nozzles to discharge an ink drop are sequentially allotted in respective printing stages.

The recording is performed with the three-parted printing head, repeating to convey a recording medium (a recording sheet) by 1/3 length of the recording width (10 dot lines) in a longitudinal direction at each scanning of the printing head.

The multi-level printing is performed in this manner. In Fig. 12, one printing pixel is represented by an area for three ink drops, which simplifies the explanation, however, in actual printing, three ink drops are discharged at the same position as overstrike recording.

However, a copying machine having the above printing mechanism has to repeat read-scanning three times while shifting the recording medium by 1/3 recording width for the second and third scannings to form a complete printing pixel, which takes a long period. In addition, image data density obtained in the second reading may be different from that obtained in the initial reading due to noise which occurs during the scanning, thus causing subtle difference in density level between the original image and the output image. In a case where overstrike printing, as a second printing by the nozzles 11 to 20 from the second scanning, is made upon an initial printed image by the nozzles 1 to 10 from the first scanning, the second image data for the second printing is not necessarily the same as the first image data.

The present invention has been made in consideration of the above situation, and is concerned with providing an image processing apparatus which improves image quality, especially, multi-level image quality.

An embodiment of the present invention provides an image processing apparatus which records read image with high-quality.

Further, another concern of the present invention is the provision of an image processing apparatus which reduces the number of reading operations and prevents variation in printing data due to noise of image signals.

According to the present invention, there is provided an image processing apparatus which records a multi-level image by scanning of a recording head having an array of M-pixel recording elements divided into N groups, and by conveying a recording medium by a width of one group at one scanning of the recording head, comprising: image reading means for reading an original image in band units, the band having a width corresponding to a width of the array of M-pixel recording elements; memory means for storing read image for at least two band units; recording data generation means for generating binary data corresponding to the respective groups of the recording head in accordance with the image data stored in the memory means; and control means for supplying the binary data generated by the recording data generation means to corresponding groups of the recording head.

Another aspect of the invention provides an image processing apparatus which records a multi-level image by scanning of a recording head having an array of M-

3                              EP 0 869 661 A1                              4

pixel recording elements divided into N groups, and by conveying a recording medium by a width of one group at one scanning of the recording head, comprising: image reading means for reading an original image in band units, the band having a width corresponding to a width of the array of M-pixel recording elements; recording data generation means for generating binary data corresponding to the respective groups of the recording head in accordance with image data read by the image reading means;

memory means for storing the binary data generated by the recording data generation means for the respective groups of the recording head; and control means for supplying the binary data for the respective groups of the recording head stored in the memory means to the groups of the recording head respectively.

A further aspect of the invention provides an image processing apparatus comprising: reading means, having reading elements of P-dot lines, for reading an original image by scanning; a recording head having M-recording elements divided into N-recording groups (N ≧ 2); convey means for conveying a predetermined recording medium by one recording group width at one scanning of the recording head; memory means for storing read image data for at least two scannings of the reading means so as to provide the image data to said recording head; and control means for activating the reading means when there is no image data to be recorded for one scanning of the recording head or amount of recorded image data or meaningless image data in the memory means corresponds to amount of one scanning of the recording head.

The present invention is also concerned with providing a method for controlling an image processing apparatus comprising reading means, having a reading element for P-dot line, for reading an original image by scanning, a recording head having M-recording elements divided into N-recording groups (N ≧ 2), and memory means for storing image data read by the reading means so as to record the data by the recording head, comprising: a convey step of conveying a predetermined recording medium by one recording group width at one scanning of the recording head; and a storage step of activating the reading means and storing the read image data into the memory means when there is no image data to be recorded for one scanning of the recording head or amount of recorded image data or meaningless image data in the memory means corresponds to amount of one scanning of the recording head.

Other features and advantages of the present invention will be apparent from the following description taken in conjunction with the accompanying drawings, in which like reference characters designate the same or similar parts throughout the figures thereof.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and constitute a part of the specification, illustrate embodiments of the invention and, together with the description, serve to explain the principles of the invention.

Fig. 1 is a block diagram showing the configuration of a copying machine in a first embodiment;

Fig. 2 illustrates the relation between reading of an original image and recording operation in the first embodiment;

Fig. 3 illustrates an image recorded by scannings of a printing head in the first embodiment;

Fig. 4 is a timing chart showing timings of reading, storing and outputting operations in the first embodiment;

Figs. 5A to 5C illustrate data transferred to the printing head;

Fig. 6 illustrates the relation between respective groups of the printing head and four-level image pixels;

Fig. 7 is a block diagram showing the configuration of a copying machine according to a second embodiment;

Fig. 8 illustrates four-level image data stored in a memory for one recording color component in the second embodiment;

Fig. 9 illustrates the relation between scanning of a printing head and recording contents in the second embodiment;

Fig. 10 illustrates memory contents for one recording color components in the second embodiment;

Figs. 11A to 11C illustrate image data transferred to the printing head in the second embodiment;

Fig. 12 conceptually illustrates overstrike recording by a multi-nozzle;

Figs. 13A and 13B are diagrams for explaining problems in overstrike recording;

Fig. 14 is a diagram showing the construction of a printer in the embodiments;

Fig. 15 illustrates another example of dot-allotting logic; and

Fig. 16 illustrates practical printing procedures in Fig. 15.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Preferred embodiments of the present invention will be described in detail in accordance with the accompanying drawings.

In the embodiments, a large number of nozzles provided in a printing head are divided into three groups and thus three-part printing head runs along one line a plural times to record a multi-level image (divisional recording).

In these three groups, the first group is activated upon image recording over density level 1; the second group, over density level 2; and the third group, over density level 3. More specifically, the first and the second groups record the density level 2 pixels in a four-level image.

However, fixing a group for a density level in this manner may cause density unevenness due to density balance between the groups.

For this reason, even if an image pixel of density level 1 is recorded, the second or third groups is used as well as the first group, to suppress density unevenness due to the shape or diameter of printing heads.

However, density unevenness of an output image may occur in this arrangement if the aforementioned conventional copying processing is employed.

The problems in the conventional processing will be described in detail with reference to Figs. 13A and 13B.

In Figs. 13A and 13B, the printing head has thirty ink jet nozzles aligned in its longitudinal direction. The nozzles are divided into three groups (1-10, 11-20 and 21-31). The printing head records an image by four level (0-3 density level).

Fig. 13A shows ideal recording densities in one line of an image to be printed.

In Fig. 13A, the density level of pixel 130 is represented as "1" and the pixel 130 is recorded by nozzle 1 in the first block of the printing head. It should be noted that it is not because the density level is "1" that the nozzle 1 is employed. When the density level is "1", only nozzle 11 (the second group) or only nozzle 21 (the third group) may be used to discharge an ink drop. In case of density level "1", any group can be used to discharge one ink drop, and the group can be determined by an appropriate rotation or using random numbers, explanations of which will be omitted here.

The density level of pixel 131 is "0", indicating that it is not recorded by any nozzle. The density level of pixel 132 is "2", indicating that two ink drops are to be discharged. The nozzles used to discharge two ink drops for the pixel 132 are the nozzles 11 and 21. However, in this case, the nozzle 1 and the nozzle 21 may be used for the same reason as that in the explanation of the pixel 130.

As shown in Fig. 13A, the printing head scans the object line three times and records image having a density level order of 1, 0, 2, 1, 2, 0, 1, 3... However, problem occurs if the original is read at each motion of the printing head, for a reading of the same line of the same original does not always provide the same read data of the same density as data from a previous reading. Aforementioned noise and lack of uniformity of scanner's reading characteristics are considered as factors of the problem.

Fig. 13B shows an example where the reading scanner reads the same line of the same image three times but the density levels in each reading are different.

In the first scanning, the nozzle 1 in the first group

is to discharge an ink drop at pixel 133, 134, 135 and 136. Note that parenthesized numeral denotes the nozzle to be used in subsequent scanning. For example, at the pixel 135, the density level of the first scanning is "3" (maximum density), the nozzles 11 and 21 are pre-assigned for subsequent scannings. However, as the density level of the pixel 135 is "2" at the second and third scannings, two ink drops are recorded. Accordingly, the recording results of the object line is as shown by numeral 137, which differs from that shown in Fig. 13A.

[First Embodiment]

⟨Construction of Apparatus⟩

Fig. 1 is a block diagram showing the configuration of a copying machine according to the first embodiment. It should be noted that in this embodiment, one printing pixel is recorded by four density level (zero to three) for simplification of explanation, however, it goes without saying that three levels or more levels, e.g., five density level or six density level can be employed.

Similarly to conventional copying machines, the copying machine in this embodiment comprises a scanner for reading an original image and a printer for recording the read image. The respective elements of the configuration will be described below.

Reference numeral 101 denotes a glass platen on which an original is placed; and 102, an illumination lamp for illuminating the original. The lamp 102 is charged by CVR 119, and the charge value is adjustable. Reflection light from the original is image-formed in image sensor (CCD) 104 via lens 103 and is converted into an electric signal. Amplifier 105 amplifies the signal to a predetermined amount and A/D converter 106 converts the amplified signal into digital image data (hereinafter simply referred to as "image data"). As the image data includes shading by the illumination lamp 102, the lens 103 and the image sensor 104, shading corrector 107 corrects the shading. Normally, the shading corrector corrects the input digital image signal such that the output resulting from inputting a value from reading a reference white plate value becomes the maximum.

The shading-corrected image data is provided to masking corrector 108 and memory 118. The masking corrector 108 corrects spectral characteristic of the image sensor 104. Expansion/compression interpolator 109 expands or compresses the image data outputted from the masking corrector 108. The interpolator 109 performs thinning upon compression, while it performs interpolation upon expansion. The operation of the interpolator 109 is publicly known and therefore the explanation of the operation will be omitted. Log transformer 110 converts the expanded/compressed luminance (RGB) signal into a density (CMY) signal. UCR (under color remover) 111 extracts a black (K) component from the signal, and masking corrector 112 performs color correction corresponding to the inks.

Edge/smoothing unit 113 performs edge emphasis or smoothing upon the color-corrected signal. Thereafter, γ/offset unit 114 performs density correction and supplies the corrected signal to four-level processor 115. The operation of the four-level processor 115 will be described later.

Numeral 116 denotes an operation controller (including a CPU, a ROM and a RAM) for controlling message indication, control panel 117 and the operation of the aforementioned elements, further, for controlling motor 120 for moving a reader (the lens 103, the illumination lamp 102 and the image sensor 104) to a predetermined position.

The image signal ("A" in Fig. 1) read in the above manner is transferred to the printer section.

Head controller 121 transfers the signal A (CMYK) to printing head 122 for respective colors to perform printing. Numeral 123 denotes a recording medium (recording sheet); 124, a roller for conveying the recording medium 123; 125, a motor for rotationally driving the roller 124; 126, a motor for moving the printing head 122 (a carriage having printing heads for respective colors); and 127, a motor controller for controlling the motor 126.

⟨Image Reading and Printing Data Output⟩

Original image reading by the copying machine having the above construction and data output to the printing head 122 will be described in detail.

Fig. 2 is a diagram for explaining reading of an original image by the copying machine in the present embodiment. As shown in Fig. 2, as the image sensor scans once, the printing head scans three times, and the recording sheet is conveyed by 1/3 length of the recording width at each scanning of the printing head. Note that since the printing head runs over the top and the bottom of the image, the actual number of the scannings of the printing head is "the number of scannings of the image sensor × 3 + 2". In Fig. 2, the number of scannings of the image sensor is three and that of the printing head is eleven. Fig. 3 shows the correspondence of the scanning of the printing head to a recording image at each scanning. As described above, the recording is made by plural scannings of the printing head per one scanning of the image sensor.

Fig. 4 shows the structure of the memory 118, reading timings of the image sensor and printing timings to realize the operations shown in Figs. 2 and 3.

The memory 118 has a capacity for storing read image data obtained from two scannings of the image sensor. The memory is evenly divided into six areas as areas 118a to 118f. The areas 118a to 118f are "0" initialized prior to the start of printing.

Upon the first reading by the image sensor, the read data is stored into the areas 118d, 118e and 118f of the memory 118 via the shading corrector 107. It should be noted that the reading and storing operations are performed at timing $T_1$ which is the previous timing of the first printing by the printing head 122.

When the first reading is completed, the data in the areas 118b, 118c and 118d of the memory 118 are outputted to the masking corrector 108 for printing the data from these areas (the first scan-printing). The first printing corresponds to "1" of the printing order shown in Fig. 2 and to (2-1) in Fig. 3 in which the areas 118b and 118c are filled with "0" data. Fig. 5A shows the timing of the data transfer to the printing head at this time. Upon the second scan-printing, the data in the areas 118c, 118d and 118e are outputted to the masking corrector 108 ((2-2) in Fig. 3). Fig. 5B shows the timing of the data transfer to the printing head at this time. Upon the third printing, the data in the areas 118d, 118e and 118f are outputted ((2-3) in Fig. 3). Fig. 5C shows the timing of the data transfer to the printing head at this time. At this time (from the completion of the second printing to the beginning of the fourth printing at timing $T_2$), as the existence of data in the areas 118a, 118b and 118c become meaningless (as they are already printed), the image sensor performs the second reading, and the image data are shading-corrected and stored into the areas 118a, 118b and 118c. The image sensor may perform reading when the amount of printed-data in the memory 118 corresponds to amount of one scanning of the printing head or more.

When the second image reading is over, the fourth scan-printing of the printing head is executed. In this case, the image data in the areas 118e, 118f and 118a are outputted to the masking corrector 108 ((2-4) in Fig. 3). Thus, the readings and printings are repeated in accordance with timings as shown in Fig. 4. Upon the last two printings, printing heads which are not concerned with these printings are provided with non-printing data (=0).

Reading of the image, storing of the read data into the memory 118 and outputting the data are executed at the timings as described above. Followings are actual printing processings.

The printing head 122 in the present embodiment comprises four printing head portions for respective color components (C, M, Y and BK), each head portion having n-ink discharging nozzles aligned in a longitudinal direction of the head 122. The nozzles are divided into three groups. A four-level image is recorded by overstrike printing shifting the three nozzle groups.

The four-level processor 115 determines whether or not to use only the first group to discharge an ink drop for density level "1", then whether or not to also use the second group to discharge an ink drop for density level "2", and whether or not to further use the third group to discharge an ink drop for density level "3".

For the sake of simplification of explanation, in the four-level processor 115, a threshold upon generating a binary image recorded by the first nozzle group is $Th_1$, a threshold upon generating a binary image recorded by the second group is $Th_2$ and a threshold for the third

group is $Th_3$. The relation among the thresholds is:

$$Th_1 < Th_2 < Th_3$$

This relation can be applied to all the recording color components. If the density of an input image pixel is lower than $Th_1$, the density level is determined to be "0"; if the density is over $Th_1$ and lower than $Th_2$, the density level is determined to be "1"; if the density is over $Th_2$ and lower than $Th_3$, the density level is determined to be "2"; and if the density is over $Th_3$, the density level is determined to be "3".

It should be noted that this does not pose any limitation upon the present invention, and any binary processing which determines whether or not discharging an ink drop at each nozzle group can be used.

Fig. 6 shows that the first printing pixel is recorded by the first and second nozzle groups; the second pixel, by only the first group; and the third pixel, by the first to third groups. In this manner, one printing pixel can be represented by 0 to 3 four-level density value.

As described above, the present embodiment reduces the number of reading operations and prevents variation in printing data due to noise of an image signal.

[Second Embodiment]

Next, the second embodiment of the present invention will be described below.

Fig. 7 is a block diagram showing the configuration of a copying machine according to the second embodiment.

In the first embodiment, input RGB multi-level data is stored into the memory, and the processing by the masking corrector 108 and the subsequent processings are repeated at each scan-printing of the printing head, however, the present invention is not limited to this arrangement.

In the second embodiment, four-level data for respective C, M, Y, K components are stored immediately before recording. Note that image reading scannings and printings are performed at timings similar to those in the first embodiment.

Accordingly, the difference between Figs. 7 and 1 is only the positions of memory 502 and four-level converter 501 in Fig. 7. Other elements in Fig. 7 correspond to those in Fig. 1 and therefore the corresponding elements have the same reference numerals and the explanations of these elements will be omitted.

The four-level converter 501 converts YMCK multi-level data obtained from the $\gamma$/offset unit 114 into binary data to be printed by the first to third nozzle groups of the printing head in color component units.

For example, Y component memory in the memory 502 is arranged as shown in Fig. 8. Other component memories have a similar structure.

As shown in Fig. 8, the Y component memory has a plane for storing binary data (data of discharging/non-discharging an ink) to be recorded by the first nozzle group of the printing head, a plane for storing binary data to be recorded by the second group and a plane for binary data to be recorded by the third group. Similarly to the first embodiment, each plane has a capacity for storing image data by two readings.

Next, the printing operation in this embodiment will be described with reference to Figs. 9 to 11.

In the first scan-printing of the printing head, the first nozzle group of the printing head prints area 1-(a) in Fig. 10, and the second and third groups do not print any data (this status is represented as "white (0) in Figs. 11A to 11C). Fig. 11A shows the timing of data transfer to the printing head at this time.

In the second scan-printing of the printing head, the first nozzle group prints area 1-(b), the second group prints area 2-(a) and the third group does not print any data. Fig. 11B shows the timing of data transfer to the printing head at this time.

In the third scan-printing of the printing head, the first group print area 1-(c), the second group prints 2-(b) and the third group prints area 3-(a). These processings are continued in this manner. Further, other color component data are processed in a similar manner.

In the second embodiment, one color component memory is divided into three planes, however, this does not pose any limitation upon the present invention. The memory can manage four-leveled data using only one plane, if it manages the data by three bits.

As described above, the present embodiment reduces the number of reading operations and prevents variation in printing data due to noise of an image signal.

In the first and second embodiment, a color image is recorded in four density level, however, the present invention is not limited to this arrangement. It goes without saying that more/less density level can be applied to the recording operation.

In these embodiments, an ink-jet printer is employed as an example of the printer, however, the printer is not limited to the ink-jet printer. The embodiments is applicable to any type of printer which forms a printing pixel having gradation by overstrike recording (printing at one pixel position plural times).

The structure of the printer of the embodiments and operations of the constituents of the printer will be described with reference to Fig. 14.

In Fig. 14, carriage (HC) is engaged with spiral groove 5004 of lead screw 5005 which rotates via driving force transmission gears 5011 and 5009 interlocking with forward/reverse rotation of driving motor 5013. The carriage has a pin (not shown) to fit in the ditch of the lead screw 5005 and it is reciprocally moved in directions represented by arrows $a$ and $b$ along guide 5003. The carriage has ink-jet cartridge (IJC), which comprises printing heads for C, M, Y and BK color components. Each printing head has a plurality of nozzles

aligned in the longitudinal direction of the carriage. As described above, these nozzles are divided into three groups and driven in group units. Paper bail 5002 presses a recording sheet against platen 5000 along the moving direction of the carriage. Photocouplers 5007 and 5008 are home position detecting members for confirming the existence of lever 5006 of the carriage in this area and changing over the rotational direction of motor 5013. Support member 5016 supports cap member 5022 for capping the front surface of the printing head. Suction member 5015 performs suction-restoration of the printing head the inside of the cap member 5022 via cap inner opening 5023. Member 5019 allows cleaning blade 5017 to move in a back-and-forth direction. Main body support plate 5018 supports the member 5019 and the cleaning blade 5017. It goes without saying any publicly-known cleaning blade is applicable to the printer of the embodiments. Numeral 5021 denotes a lever for starting the sucking operation of the suction-restoration. The lever 5021 moves along the movement of cam 5020 engaged with the carriage. A publicly-known transmission means such as change-over of a clutch controls a driving force from the driving motor.

When the carriage arrives at the home position, a desired processing among the capping, cleaning and suction-restoration is executed at its corresponding position by the lead screw 5005. Any of these processings is applicable to the printer of the embodiments, if a desired processing is performed at a publicly-known timing.

As described above, the first and second embodiments reduce the number of reading operations and prevent variation in printing data due to noise of an image signal.

[Third Embodiment]

In the previous embodiments, the combination of nozzle groups of the printing head to record a density level is fixed. Still there might occur density unevenness due to difference in usage frequency between the respective nozzle groups.

Accordingly, in the third embodiment, in accordance with a density level value of one complete pixel, nozzle groups are sequentially assigned to overstrike recording so that usage frequency of the respective groups becomes substantially equal to each other.

In Fig. 15, the pixels respectively have density levels 2, 1 and 3. The first pixel is recorded with two ink drops; the second pixel, with one ink drop; and the third pixel, with three ink drops. This corresponds to Fig. 6, however, the third embodiment has the following difference.

In this embodiment, logical ink-discharging order is fixed as the first group → the second group → the third group → the first group ... regardless of the position of a pixel to be recorded.

Accordingly, the first pixel 40 in Fig. 15 is printed by discharging an ink drop using the first group at the first recording and discharging an ink drop using the second group at the second recording. As the density level of the pixel 40 is "2", ink-discharging for the pixel 40 is not performed any longer. Upon printing the next pixel 41, as the first and second groups have already been used, the third group is used to discharge an ink drop. The density level of the pixel 41 is "1" and the ink-discharging for this pixel is completed. Upon printing the third pixel 42, as the nozzle groups have been used from the first group to third group, again the first group is employed. As the density level of the pixel 42 is "3", the second and third groups are subsequently used.

It could be understood that the above recording order is a logical order and its practical order is as shown in Fig. 16.

More specifically, upon the first scanning of the printing head, corresponding nozzles discharge an ink drop at the positions of the pixels 40 and 42. Upon the second scanning, corresponding nozzles discharge an ink drop at the positions of the pixels 41 and 42. Upon the third scanning, corresponding nozzles discharge an ink drop at the positions of the pixels 41 and 42.

As a result, the pixel 40 has a density level "2"; the pixel 41, a density level "1"; and the pixel 42, a density level "3".

As described above, the third embodiment easily realizes binary status processing of discharging/non-discharging of an ink drop by simply assigning the nozzle groups in accordance with the order of groups, and obtains an excellent image.

In the first to third embodiments, a multi-color recording apparatus is used as an example, however, this does not impose any limitation upon the present invention. The present invention is also applicable to a monochrome recording apparatus. Further, in the first to third embodiments, multi-level recording is described as an example, however, the present invention is not limited to this recording.

According to the present invention, in a case where the printing head records one line (the same area) by its plural scannings, e.g., it records one line by overstrike printing, the image sensor (printing head) reads one line only once.

Accordingly, the present invention can be applied to binary recording in which one line is complementarily scan-printed plural times and emphasis recording in which recording of one line is repeated plural times with the same data.

As described above, in an apparatus having a recording width thrice of its printing head width, three recording processings by the printing head are executed based on an image read at one reading processing, which prevents density unevenness due to noise.

It should be noted that the present invention is not limited to a copying machine, but is applicable to an apparatus separately comprising an image reader, a

printer and a control device for controlling the reader and the printer, since the above-described processings can be realized if the controller has control programs for controlling the reader and the printer in accordance with the processings of the present invention.

In the first to third embodiments, the reading width of the scanner is thrice of the printing head width, however, the reading width may be wider or narrower than this width. In addition, it is not necessary that the reading width is an integral multiple of the printing head width.

The present invention brings about excellent effects particularly in a recording head and a recording device of the ink jet system using a thermal energy among the ink jet recording systems.

As to its representative construction and principle, for example, one practiced by use of the basic principle disclosed in, for instance, U.S. Patent Nos. 4,723,129 and 4,740,796 is preferred. The above system is applicable to either one of the so-called on-demand type and the continuous type. Particularly, the case of the on-demand type is effective because, by applying at least one driving signal which gives rapid temperature elevation exceeding nucleus boiling corresponding to the recording information on electrothermal converting elements arranged in a range corresponding to the sheet or liquid channels holding liquid (ink), heat energy is generated by the electrothermal converting elements to effect film boiling on the heat acting surface of the recording head, and consequently the bubbles within the liquid (ink) can be formed in correspondence to the driving signals one by one. By discharging the liquid (ink) through a discharge port by growth and shrinkage of the bubble, at least one droplet is formed. By making the driving signals into pulse shapes, growth and shrinkage of the bubble can be effected instantly and adequately to accomplish more preferably discharging of the liquid (ink) particularly excellent in accordance with characteristics. As the driving signals of such pulse shapes, the signals as disclosed in U.S. Patent Nos. 4,463,359 and 4,345,262 are suitable. Further excellent recording can be performed by using the conditions described in U.S. Patent No. 4,313,124 of the invention concerning the temperature elevation rate of the above-mentioned heat acting surface.

As a construction of the recording head, in addition to the combined construction of a discharging orifice, a liquid channel, and an electrothermal converting element (linear liquid channel or right angle liquid channel) as disclosed in the above specifications, the construction by use of U.S. Patent Nos. 4,558,333 and 4,459,600 disclosing the construction having the heat acting portion arranged in the flexed region is also included in the invention. The present invention can be also effectively constructed as disclosed in JP-A-59-123670 which discloses the construction using a slit common to a plurality of electrothermal converting elements as a discharging portion of the electrothermal

converting element or JP-A-59-138261 which discloses the construction having the opening for absorbing a pressure wave of a heat energy corresponding to the discharging portion.

In addition, the invention is effective for a recording head of the freely exchangeable chip type which enables electrical connection to the main device or supply of ink from the main device by being mounted onto the main device, or for the case by use of a recording head of the cartridge type provided integrally on the recording head itself.

It is also preferable to add a restoration means for the recording head, preliminary auxiliary means, and the like provided as a construction of the recording device of the invention because the effect of the invention can be further stabilized. Specific examples of them may include, for the recording head, capping means, cleaning means, pressurization or aspiration means, and electrothermal converting elements or another heating element or preliminary heating means according to a combination of them. It is also effective for performing a stable recording to realize the preliminary mode which executes the discharging separately from the recording.

As a recording mode of the recording device, further, the invention is extremely effective for not only the recording mode of only a primary color such as black or the like but also a device having at least one of a plurality of different colors or a full color by color mixing, depending on whether the recording head may be either integrally constructed or combined in plural number.

As many apparently widely different embodiments of the present invention can be made without departing from the spirit and scope thereof, it is to be understood that the invention is not limited to the specific embodiments thereof except as defined in the appended claims.

1. An image processing apparatus which records a multi-level image by scanning of a recording head having an array of M-pixel recording elements divided into N groups, and by conveying a recording medium by a width of one group at one scanning of the recording head, comprising:

image reading means for reading an original image in band units, the band having a width corresponding to a width of the array of M-pixel recording elements;

memory means for storing read image for at least two band units;

recording data generation means for generating binary data corresponding to the respective groups of the recording head in accordance with the image data stored in said memory means; and

control means for supplying the binary data generated by said recording data generation

means to corresponding groups of the recording head.

2. The apparatus according to clause 1, wherein said image reading means is activated when amount of recorded data or meaningless image data corresponds to amount of scannings for the N-groups of the recording head.

3. The apparatus according to clause 1, wherein said image reading means includes means for converting the read image data into N+1 gradation data.

4. The apparatus according to clause 1, wherein when a density level of an object pixel to be recorded is d($1 \leq d \leq N$), said control means activates recording corresponding elements in from first to d-th groups of the recording head.

5. The apparatus according to clause 1, wherein when a density level of an object pixel to be recorded is d ($1 \leq d \leq N$), said control means sequentially activates corresponding recording elements in d-groups of the recording head from a group next to i-th group ($1 \leq i \leq N$) having recording means for completing a density of a previous pixel of the object pixel to be recorded.

6. An image processing apparatus which records a multilevel image by scanning of a recording head having an array of M-pixel recording elements divided into N groups, and by conveying a recording medium by a width of one group at one scanning of the recording head, comprising:

   image reading means for reading an original image in band units, the band having a width corresponding to a width of the array of M-pixel recording elements;
   recording data generation means for generating binary data corresponding to the respective groups of the recording head in accordance with image data read by said image reading means;
   memory means for storing the binary data generated by said recording data generation means for the respective groups of the recording head; and
   control means for supplying the binary data for the respective groups of the recording head stored in said memory means to the groups of the recording head respectively.

7. The apparatus according to clause 6, wherein each of said M-recording elements records a pixel by discharging an ink.

8. An image processing apparatus comprising:

   reading means, having reading elements of P-dot lines, for reading an original image by scanning;
   a recording head having M-recording elements divided into N-recording groups ($N \geq 2$);
   convey means for conveying a predetermined recording medium by one recording group width at one scanning of said recording head;
   memory means for storing read image data for at least two scannings of said reading means so as to provide the image data to said recording head; and
   control means for activating said reading means when there is no image data to be recorded for one scanning of said recording head or amount of recorded image data or meaningless image data in said memory means corresponds to amount of one scanning of said recording head.

9. The apparatus according to either of clauses 1 or 7, wherein said M-recording elements are uniformly aligned.

10. The apparatus according to clause 9, wherein said recording head has an ink jet nozzle.

11. The apparatus according to either of clauses 1 or 10, wherein the recording elements or the nozzle discharge or discharges an ink by thermal energy.

12. The apparatus according to either of clauses 1 or 7, wherein said M-recording elements are equally divided.

13. The apparatus according to clause 7, further comprising N+1 level processing means for converting respective pixel data of the image data stored in said memory means into N+1 level data, wherein said control means includes activation means for activating corresponding recording elements in the respective recording groups of said recording head at a predetermined timing based on the N+1 leveled pixel data converted by said N+1 processing means.

14. The apparatus according to clause 13, wherein when the N+1 level pixel data has value i ($1 \leq i \leq N$), said activation means activates corresponding recording elements in from first to i-th groups of the recording head.

15. The apparatus according to clause 13, wherein when the N+1 level pixel data has value i ($1 \leq i \leq N$), said activation means activates corresponding recording elements in i-groups of the recording

head from a group next to j-th group (1 ≤ j ≤ N) having a recording element for completing a density of a previous pixel of an object pixel to be recorded.

16. A method for controlling an image processing apparatus comprising reading means, having a reading element for P-dot line, for reading an original image by scanning, a recording head having M-recording elements divided into N-recording groups (N ≥ 2), and memory means for storing image data read by said reading means so as to record the data by said recording head, comprising the steps of:

conveying a predetermined recording medium by one recording group width at one scanning of said recording head; and
storing the read image data into said memory means by activating said reading means when there is no image data to be recorded for one scanning of said recording head or amount of recorded image data or meaningless image data in said memory means corresponds to amount of one scanning of said recording head.

17. The method according to clause 16, further comprising the steps of:

converting respective pixel data of the image data stored in said memory means into N+1 level data; and
activating corresponding recording elements in the respective recording groups of said recording head at a predetermined timing based on the N+1 leveled pixel data converted by said N+1 processing means.

18. The method according to clause 16, wherein, in the activating step, when the N+1 level pixel data has value i (1 ≤ i ≤ N), corresponding recording elements in from first to i-th groups of the recording head are activated.

19. The method according to clause 16, wherein, in the activating step, when the N+1 level pixel data has value i (1 ≤ i ≤ N), corresponding recording elements in i-groups of the recording head are activated from a group next to j-th group (1 ≤ j ≤ N) having a recording element for completing a density of a previous pixel of an object pixel to be recorded.

20. An image processing apparatus which records an image read by scanning of a reading hand on a recording medium by scanning of a recording head, comprising:

read-scanning means for sequentially moving

the reading head relatively to an original so as to read original image; and
record-scanning means for moving said recording head relative to an area of the recording medium plural times in response to one read-scanning of the reading head by said read-scanning means so as to record the read image on the area.

21. The apparatus according to clause 20, wherein said record-scanning means performs the record-scanning of said recording head plural times using different portions of said recording head upon the area of the recording medium.

22. The apparatus according to clause 21, wherein the plural record-scannings of said recording head records a gradation image.

23. The apparatus according to clause 20, further comprising storage means for storing the image read in accordance with at least two read-scannings of said reading head by said read-scanning means.

24. The apparatus according to clause 20, wherein said recording head discharges an ink.

25. The apparatus according to clause 24, wherein said recording head discharges an ink by thermal energy.

26. The apparatus according to clause 20, further comprising convey means for conveying the recording medium by a width of the predetermined area in a direction different from that of the record-scanning of said recording head.

27. An image processing method for recording a read image, comprising the steps of:

read-scanning the reading head relatively to an original so as to read original image;
record-scanning said recording head relative to an area of the recording medium plural times in response to one read-scanning of the reading head by said read-scanning step so as to record the read image on the area; and
repeating said read-scanning step and said record-scanning step so as to complete the original image.

28. The method according to clause 27, wherein in the record-scanning step, the record-scanning of said recording head is performed plural times using different portions of said recording head upon the area of the recording medium.

29. The method according to clause 28, wherein the plural record-scannings of said recording head in the record-scanning step records a gradation image.

30. The method according to either clause 20 or claim 27, wherein in the record-scanning step, the record-scanning of said recording head is performed plural times upon the area of the recording medium using a same portion of said recording head.

31. The method according to clause 30, wherein the plural record-scannings of said recording head in the record-scanning step records an emphasized image.

32. The method according to clause 27, further comprising the step of:

storing the image read in accordance with at least two read-scannings of said reading head in the read-scanning step.

33. The method according to clause 27, wherein said recording head discharges an ink.

34. The method according to clause 33, wherein said recording head discharges an ink by thermal energy.

35. The method according to clause 27, further comprising the step of:

conveying the recording medium by a width of the predetermined area in a direction different from that of the record-scanning of said recording head.

**Claims**

1. An image processing apparatus which records an image read by scanning of a reading means on a recording medium by scanning of a recording head, comprising:

read-scanning means for sequentially moving the reading means relatively to an original so as to read an original image; and
record-scanning means for moving said recording head relative to a predetermined area of the recording medium plural times in response to one read-scanning of the reading means by said read-scanning means so as to record a recorded image corresponding to the read original image on the predetermined area.

2. Apparatus according to claim 1 and further comprising:

a recording head (112) having an array of pixel recording elements;
first scan means (126) for moving the recording head in a main scan direction relative to a recording medium;
second scan means for moving the recording medium relative to the recording head in a sub-scan direction transverse to said main scan direction;
image reading means (102, 103) for reading an original image to generate original image data;
memory means (118) for storing said image data;
recording data generating means for generating binary image data from the original image data; and
control means (116) for controlling the operation of said reading means, said first and second scan means and said recording data generating means and for driving the recording elements of the recording head in response to the binary image data;
wherein the recording head has an array of pixel recording elements extending in said sub-scan direction, the pixel array being divided into N, $N \geq 2$ groups; said reading means is adapted to read an original image in bands, each band having a width corresponding to the width of the array of pixel recording elements in the sub-scan direction; said memory means is adapted to store image data representing at least two bands of said original image; and said recording data generating means is adapted to generate the binary image data in accordance with the respective groups of pixel recording elements and to control the scanning of the recording head relative to a recording medium during a recording operation in such a manner that when a read original image is recorded the second scan means are adapted to move the recording medium relative to the recording head for a distance equal to the width in the sub-scan direction of a single group of said recording elements, and to control the scanning of the recording head in the main scan direction so that each area of the recording medium is scanned by more than one group of said N-groups of recording elements.

3. Apparatus according to claim 2, wherein said recording data generating means is adapted to generate pixel data having N + 1 density levels per pixel.

4. Apparatus according to claim 3, wherein said con-

21                    EP 0 869 661 A1                    22

trol means is adapted to control said recording head and said first and second scan means such that where a pixel to be recorded has a density level greater than 1, the pixel is recorded by recording elements in different ones of said groups and in different scans.

5. Apparatus according to claim 4, wherein said recording data generating means are adapted to generate binary image data having four density levels (0-3) (N=3), so that a recorded pixel contains 1, 2 or 3 dots each dot being generated by a recording element in a different group.

6. Apparatus according to either of claims 4 or 5, wherein when a sequence of pixels are recorded the logical sequence in which the recording elements operate is fixed so that after a recording element of one group has recorded on the recording medium, the next recording is carried out by a recording element of the next group and so on.

7. Apparatus according to any preceding claim, wherein each of said recording elements is adapted to record by discharging ink.

8. Apparatus according to claim 7, wherein the recording elements discharge ink by thermal energy.

9. An image processing method for recording a read image, comprising the steps of:

read-scanning a reading means relatively to an original so as to read an original image;
record-scanning said recording head relative to a predetermined area of the recording medium plural times in response to one read-scanning of the reading means by said read-scanning step so as to record a recorded image corresponding to the read original image on the predetermined area; and
repeating said read-scanning step and said record-scanning step so as to complete the original image,
wherein said recorded image recorded by the recording head on the predetermined area is based on the original image read in the read-scanning step.

10. A method according to claim 9 of and further recording a multi-level image, comprising:

scanning (126) a recording head having an array of pixel recording elements by a first scan means in a main scan direction relative to a recording medium;
moving the recording medium by a second scan means relative to the recording head in a

sub-scan direction transverse to said main scan direction;
reading (102, 103) an original image by a reading means to generate original image data;
storing (118) said image data;
generating binary image data from the original image data by a recording data generating means; and
controlling (116) the operation of said reading means, said first and second scan means and said recording data generating means and for driving the recording elements of the recording head in response to the binary image data;
wherein the recording head has an array of pixel recording elements extending in said sub-scan direction, the pixel array being divided into N, N ≥ 2 groups; said original image is read in bands, each band having a width corresponding to the width of the array of pixel recording elements in the sub-scan direction; said method further comprising: storing (118) image data representing at least two bands of said original image; and generating the binary image data in accordance with the respective groups of pixel recording elements and controlling the scanning of the recording head relative to a recording medium during a recording operation in such a manner that when a read original image is recorded the recording medium is moved relative to the recording head for a distance equal to the width in the sub-scan direction of a single group of said recording elements, and scanning of the recording head in the main scan direction so that each area of the recording medium is scanned by more than one group of said N-groups of recording elements.

11. A method according to claim 10, wherein said binary pixel data has N + 1 density levels per pixel.

12. A method according to claim 11, including controlling said recording head and said first and second scan means such that where a pixel to be recorded has a density level greater than 1, the pixel is recorded by recording elements in different ones of said groups and in different scans.

13. A method according to claim 12, wherein said binary image data has four density levels (0-3) (N=3), so that a recorded pixel contains 1, 2 or 3 dots, each dot being generated by a recording element in a different group.

14. A method according to either of claims 12 or 13, wherein when a sequence of pixels are recorded the logical sequence in which the recording elements operate is fixed so that after a recording ele-

ment of one group has recorded on the recording medium, the next recording is carried out by a recording element of the next group and so on.

**15.** A method according to any one of claims 9 to 14, wherein each of said recording elements is adapted to record by discharging ink.

**16.** A method according to claim 15, wherein the recording elements discharge ink by thermal energy.

EP 0 869 661 A1



F I G. 1

EP 0 869 661 A1



FIG. 2

footer: 15

EP 0 869 661 A1



F I G. 3

EP 0 869 661 A1



F I G. 4

EP 0 869 661 A1



FIG. 5A

FIG. 5B

FIG. 5C

PRINTING HEAD WIDTH

FIRST PRINTING DATA ARRAY

SECOND PRINTING DATA ARRAY

THIRD PRINTING DATA ARRAY

(2-3)

118b  118c  118d  118b  118c  118d

118c  118d  118e  118c  118d  118e

118d  118e  118f  118d  118e  118f

EP 0 869 661 A1



F I G. 6

EP 0 869 661 A1



FIG. 7

EP 0 869 661 A1

F I G.   8



DATA FOR THIRD NOZZLE GROUP

DATA FOR SECOND NOZZLE GROUP

DATA FOR FIRST NOZZLE GROUP

EP 0 869 661 A1



FIG. 9

EP 0 869 661 A1



F I G. 10

EP 0 869 661 A1



EP 0 869 661 A1



FIG. 12

EP 0 869 661 A1



FIG. 13A

EP 0 869 661 A1



F I G.   13B

EP 0 869 661 A1



FIG. 14

EP 0 869 661 A1



F I G. 15

EP 0 869 661 A1

F I G.   16



EP 0 869 661 A1



**European Patent Office**

**EUROPEAN SEARCH REPORT**

Application Number

EP 98 20 1699

| DOCUMENTS CONSIDERED TO BE RELEVANT | | | |
|---|---|---|---|
| Category | Citation of document with indication, where appropriate, of relevant passages | Relevant to claim | CLASSIFICATION OF THE APPLICATION (Int.Cl.6) |
| A,P | EP 0 517 544 A (CANON KK) 9 December 1992<br>* page 2, line 24 - line 47; figures 1,12 *<br>--- | 1-16 | H04N1/40<br>H04N1/191 |
| A,P | WO 92 17340 A (MANNESMANN AG) 15 October 1992<br>* page 7, line 20 - page 8, line 10 *<br>--- | 1-16 | |
| A | GB 2 087 116 A (SONY CORP) 19 May 1982<br>* page 1, line 62 - page 2, line 14 *<br>* abstract; claim 1 *<br>--- | 1-16 | |
| A | US 4 933 776 A (IKEDA) 12 June 1990<br>* abstract; figure 1 *<br>----- | 1-16 | |

| | | |
|---|---|---|
| | | TECHNICAL FIELDS SEARCHED (Int.Cl.6) |
| | | H04N |

The present search report has been drawn up for all claims

| Place of search | Date of completion of the search | Examiner |
|---|---|---|
| THE HAGUE | 21 July 1998 | Isa, S |

CATEGORY OF CITED DOCUMENTS

X : particularly relevant if taken alone
Y : particularly relevant if combined with another document of the same category
A : technological background
O : non-written disclosure
P : intermediate document

T : theory or principle underlying the invention
E : earlier patent document, but published on, or after the filing date
D : document cited in the application
L : document cited for other reasons

& : member of the same patent family, corresponding document

EPO FORM 1503 03.82 (P04C01)

31

# **EXHIBIT 5**



Europäisches Patentamt

European Patent Office

Office européen des brevets



⑪ Publication number : **0 583 963 A1**

⑫ **EUROPEAN PATENT APPLICATION**

㉑ Application number : 93306448.7

㉒ Date of filing : 16.08.93

�51 Int. Cl.⁵ : **F16G 5/06**, F16G 1/08

㉚ Priority : 18.08.92 JP 63591/92

㊸ Date of publication of application :
23.02.94 Bulletin 94/08

�editer Designated Contracting States :
DE FR GB

㉑ Applicant : **MITSUBOSHI BELTING LTD.**
No. 1-21, 4-Chome, Hamazoe-dori
Nagata-ku Kobe City Hyogo, pref. (JP)

㉞ Inventor : **Kitahama, Koji**
No. 3-51, 1-chome, Kitamaiko
Tarumi-ku, Kobe, Hyogo (JP)
Inventor : **Kawashima, Masahiko**
No. 1-17, 3-chome, Kashinodai
Nishi-ku, Kobe, Hyogo (JP)
Inventor : **Mishima, Kyoichi**
No. 7-58-103, 5-chome Higashimachi,
Suzurandai
Kita-ku, Kobe, Hyogo (JP)

㉞ Representative : **Bond, Bentley George et al**
Haseltine Lake & Co. 28 Southampton
Buildings Chancery Lane
London WC2A 1AT (GB)

�554 V-Belt For Power Transmission.

�557   A power transmission belt having a belt body defining a tension section (17) and a compression section (18) and having an inside surface, an outside surface, and laterally spaced side surfaces. A canvas layer (28) is provided on at least one of the inside, outside, and side surfaces and has a first surface abutting to the belt body and a second surface that is exposed with the canvas layer on the belt body. The canvas (28) has ends joined by thread to produce an endless layer. A first part (40) of the thread is exposed on the second surface of the canvas layer and is at least one of a) a twine of natural fiber and b) multi-filament twine of synthetic fibers. A second part (44) of the thread that is exposed at the first surface of the canvas layer is a mono-filament of synthetic fiber.



FIG 1

FIG 2



## Background of the Invention

### Field of the Invention

This invention relates to power transmission belts and, more particularly, to a power transmission belt having a reinforcing canvas layer attached to a surface thereof.

### Background Art

It is known to provide a reinforcing canvas layer on an exposed surface of a power transmission belt, such as a V-ribbed belt, low-edge V-belt, wrapped V-belt, etc. A rubberized canvas layer is commonly placed on the outside surface of a power transmission belt to add peripheral reinforcement thereto. The ends of the canvas layer are joined together by sewing. Typically, the ends are overlapped so that a step is defined on the outer surface of the belt.

To avoid the creation of this "step", some manufacturers leave a gap between the ends of the canvas layer. As a result, a portion of the belt body underlying the canvas layer is exposed.

In U.S. Patent No. 5,224,905, assigned to the assignee hereof, a power transmission belt is disclosed wherein the ends of a canvas layer are abutted, edge to edge. As described more fully in that patent, this arrangement avoids localized repositioning of the load carrying cords that occurs with the sequential build-up of components over a step in a conventionally constructed canvas layer, avoids variation in the drive characteristics for the belt as when the step in the canvas layer contacts a cooperating pulley, and minimizes noise generation between the belt and cooperating pulleys, particularly at the step. While this construction permits smooth belt running and constant power transmission characteristics, it has one principal drawback.

More particularly, a problem arises in a system in which the belt is run in a reverse-bend mode. In the reverse-bend mode, the outside surface of the belt directly contacts at least one pulley in the system. For example, in serpentine drive systems on automobile engines, the outside surface of a V-ribbed belt encounters a flat pulley to effect driving thereof. While there is no step, as in the prior art, to contact a pulley and generate noise, there is still noise generated as the thread, which connects the ends of the canvas layer and protrudes outwardly of the canvas layer, encounters the pulley(s).

It is known to join the canvas layer ends using cotton thread, such as No. 40 cotton thread, to minimize noise generation as contact occurs between the thread and the system pulleys. This is commonly accomplished using known overlock machine-sewing techniques so that both the needle thread (that which is exposed on the outside surface of the canvas lay-

er) and bobbin thread (that which is exposed on the inside surface of the canvas layer) are cotton. However, cotton thread requires twisting and thus this thread is relatively expensive as compared to mono-filament threads made from synthetic fibers having the same strength and resistance to cutting. Furthermore, cotton threads of relatively large diameter bind significantly as the threads are drawn through rubberized canvas. As a result, the sewing step is lengthened compared to that for threads of lesser diameter.

To overcome this last problem, it is known to use mono-filament threads of synthetic fiber. These threads have good strength, i.e. resistance to cutting, and are less expensive than cotton threads. Further, the mono-filament synthetic fiber threads can be drawn through the canvas layer with less resistance than cotton threads of equal strength. As a result, the sewing time is reduced. A high integrity, machine-sewn joint can thus be obtained a relatively low cost. However, the mono-filament threads made from synthetic fibers likewise have drawbacks.

The mono-filament threads of synthetic fiber are relatively inflexible compared with twines of natural fiber having the same strength and resistance to cutting and multi-filament twines of synthetic fibers spun by twisting a plurality of filaments together. When a belt using these threads is reverse bent, the canvas layer compresses along the length of the belt. The thread on the outside of the canvas layer which, in normal operation, is pressed into the canvas layer, bows outwardly and protrudes from the outer surface of the canvas layer. In so doing, it generates noise as it contacts the cooperating pulley.

### Summary of the Invention

After extensive research, the present invention was arrived at and solves the above problems in the prior art. It is the principal objective of the invention to improve the connection of the ends of a covering layer, such as a canvas layer, to thereby reduce noise generation between the canvas layer on the outer surface of a power transmission belt and a cooperating pulley without compromising the integrity, or power transmission capabilities, of the belt.

In one form of the invention, a power transmission belt is provided having a belt body defining a tension section and a compression section and having an inside surface, an outside surface, and laterally spaced side surfaces. A canvas layer is provided on at least one of the inside, outside, and side surfaces and has a first surface abutting to the belt body and a second surface that is exposed with the canvas layer on the belt body. The canvas has ends joined by thread to produce an endless layer. A first part of the thread is exposed on the second surface of the canvas layer and is at least one of a) a twine of natural fiber and b) multi-filament twine of synthetic fibers. A

second part of the thread that is exposed at the first surface of the canvas layer is a mono-filament of synthetic fiber.

With the inventive structure, the integrity of the connection of the fabric layer ends is maintained while also providing a highly flexible belt. The thread portion on the exposed surface of the belt remains embedded in the canvas layer, even with the belt reversely bent, as when the outside surface is used to drive/be driven by a pulley. As a result, noise generation due to contact between the thread part on the outer surface of the canvas layer and the pulley(s) is minimized.

The natural fibers can be, for example, at least one of cotton, hemp, and wool. The synthetic fibers can be, for example, at least one of nylon, polyester, and aramid. The synthetic fibers in the first and second thread parts can be the same or different.

The invention is suitable for incorporation into all types of power transmission belts. For example, it can be incorporated into a V-ribbed belt, a low-edge V-belt, a wrapped V-belt, etc.

In one form, the canvas layer is a rubberized canvas that is on the outside surface of the belt body.

The ends of the canvas layer each define an edge. In one form, the edges are abutted to each other with the canvas layer assembled to the belt body. The belt has a length and the edges of the canvas layer are straight and preferably make an angle with the length of the belt from 25-90°.

In one method of manufacture, the ends of the canvas layer are sewn together by overlock machine sewing. Other methods of manufacture are contemplated by the invention.

The compression section of the belt, in one form, is made from rubber that is at least one of NR, SBR, CR and NBR. Short reinforcing fibers can be provided in at least the compression section of the belt. The fibers may be at least one of a) a synthetic fiber that is at least one of nylon, vinylon, polyester, and aromatic polyamide and b) natural fiber that is at least one of cotton and pulp.

The canvas layer preferably is at least one of a) cloth made of at least one of cotton, nylon, polyester, and aramid, b) woven fabric, c) cord fabric, and d) nonwoven fabric made from yarn fabric that is a blend of at least one of i) cotton and nylon and ii) cotton and polyester.

In another form of the invention, a power transmission belt is provided having a belt body with a canvas layer on one of the surfaces thereof, with the canvas layer having ends joined to each other through the use of thread and a first surface abutting to the belt body with the canvas layer on the belt body. A first part of the thread is exposed at the first surface of the canvas layer and is a mono-filament thread of synthetic fiber.

Further according to the invention, a power transmission belt is provided having a belt body with a canvas layer on at least one of the surfaces thereof, wherein the canvas layer has a first surface abutting to the belt body and a second surface that is exposed with the canvas layer on the belt body. The canvas layer has ends joined to each other through the use of thread. A first part of the thread is exposed at the second surface of the canvas layer and a second part of the thread is exposed at the first surface of the canvas layer. The first thread part is a twine, with the second thread part being a mono-filament.

Brief Description of the Drawings

Fig. 1 is a perspective view of a section of a V-ribbed belt with a canvas layer on the outside surface thereof, according to the present invention;

Fig. 2 is a cross-sectional view of the belt taken along line 2-2 of Fig. 1, with the belt reversely bent; and

Fig. 3 is a view as in Fig. 2 showing a conventional belt that is reversely bent;

Detailed Description of the Drawings

In Figs. 1 and 2, one type of power transmission belt, in this case a V-ribbed belt, is shown at 10, made accords to the present invention. It should be understood that the invention can be incorporated into virtually any type of power transmission belt i.e. a V-belt, low-edge V-belt, wrapped V-belt, etc. The depicted V-ribbed belt 10 is used only for purposes of illustrating the present invention.

The belt 10 has a tensile layer 12 which includes longitudinally extending, load carrying cords 14 which are ernbedded in an adhesive rubber layer 16. The tensile layer 12 defines a tension section 17 outside of the cords 14 The cords 14 are made from low elongation, high strength materials, such as nylon, polyester, aromatic polyamide, etc.

Inwardly of the adhesive rubber layer 16 is a compression section 18 in which longitudinally extending, laterally spaced ribs 20 are formed. The number and exact shape of the ribs 20 are design choices. The compression section 18 is preferably made from a rubber that is one, or a combination, of NR, SBR, CR, NBR, etc. The same rubber can be used to form the adhesive rubber layer 16.

The compression section 18 is shown to be reinforced by short, laterally extending fibers 22. The fibers 22 may be made from synthetic material, such as nylon, vinylon, polyester, aromatic polyamide, etc. Alternatively, natural fiber, such as cotton, pulp, etc. can be used.

The tensile layer 12 and compression section 18 cooperatively define a belt body 23. The outer surface 24 of the belt body 23 is covered by a cloth layer 26. The cloth layer 26 is, in the embodiment shown, a

rubberized canvas made of a) a cloth of cotton, nylon, polyester, aramid, etc. b) a woven fabric, c) cord fabric, or d) nonwoven fabric consisting of a blended yarn fabric of cotton and nylon, or cotton and polyester. The cloth layer 26 may be a combination of any of these cloth materials.

The canvas layer 26 has spaced ends 28, 30 which are joined together at a seam 32. A first, inside surface 34 on the canvas layer 26 abuts to the belt body 23, while an opposite surface 34 faces outwardly of the belt body 23 and is exposed to drive/be driven by a cooperating pulley (not shown).

Preferably, the canvas layer ends 28, 30 are joined in non-overlapping fashion so as not to create a step, as described in U.S. patent No. 5,224,905. More particularly, the end 28 has a straight edge 36 and the end 30 a straight edge 38 which are abutted to each other to create an endless band. The butted edges 36, 38 of the ends 28, 30 make an angle α with the length of the belt 10 between 25 and 90 degrees.

The seam 32 can be formed through a conventional overlock sewing-machine process, or by other techniques/apparatus, which are known to those in the art. The overlock sewing machine is commonly used to mass produce seems, as for industrial applications. With the seam 32 formed by an overlock machine, a first part 40 of the thread 42 (the needle thread) that is used to form the seam 32 is exposed at the outside surface 34 of the belt 10. A second part 44 of the thread 42 (the bobbin thread) abuts to the belt body 23.

The present invention is particularly suitable to be practiced using the overlock machine-sewing machine. The first thread part 40 is made from a twine, while the second thread part 44 is made from a mono-filament. More particularly, the first thread part 40 is made preferably from a twine of natural fiber, such as cotton, hemp, or wool, or a multi-filament twine (60 count) of synthetic fiber such as nylon, polyester, aramid fiber, etc. A mono-filament thread (30 count) of synthetic fibers, such as those of nylon, polyester, aramid, etc. is preferred for the second thread part 44.

The inventive structure avoids a condition as seen in the prior art belt 50 in Fig. 3. The belt 50 has the same general construction as the belt 10 in Figs. 1 and 2, including a reinforcing, covering canvas layer 51. The primary distinction is that the seam at 52 is defined by thread 53, Including a thread part 54 exposed at the outside surface 56 of the canvas layer 51 and a thread part 58 which is abutted to the outside surface 59 of the belt body 60 and made from a mono-filament thread of synthetic fiber. As can be seen, with the belt 50 reversely bent as in Fig. 3, the canvas layer 51 is compressed which causes the relatively rigid thread 54 to bow so as to project significantly outwardly from the outside surface 59 of the belt body 60 so that it will contact a cooperating pulley

surface and thereby generate noise in use.

On the other hand, with the inventive belt 10 reversely bent, as shown in Fig. 2, the more flexible thread part 40, upon being compressed, assumes the curvature of the outside surface 24 of the belt body 23 and remains embedded in the canvas layer 26 so as not to project significantly outwardly therefrom as to interfere with a cooperating pulley.

The foregoing disclosure of specific embodiments is intended to be illustrative of the broad concepts comprehended by the invention.

## Claims

1. A power transmission belt comprising:
   a belt body defining a tension section and a compression section and having an inside surface, an outside surface, and laterally spaced side surfaces; and
   a canvas layer on at least one of the inside, outside, and side surfaces,
   said canvas layer having a first surface abutting to the belt body and a second surface that is exposed with the canvas layer on the belt body,
   wherein the canvas layer has ends joined to each other through the use of thread,
   there being a first part of said thread that is exposed on the second surface of the canvas layer, said first thread part comprising at least one of a) a twine of natural fibers, and b) multi-filament twine of synthetic fibers.

2. The power transmission belt according to claim 1 wherein there is a second part of said thread that is exposed at the first surface of the canvas layer, said second thread part comprising a mono-filament thread of synthetic fibers.

3. The power transmission belt according to claim 1 wherein the natural fibers comprise at least one of cotton, hemp, and wool.

4. The power transmission belt according to claim 2 wherein the synthetic fibers in at least one of the first and second thread parts comprise at least one of nylon, polyester, and aramid.

5. The power transmission belt according to claim 2 wherein the synthetic fibers in the first and second thread parts are the same.

6. The power transmission belt according to claim 2 wherein the synthetic fibers in the first and second thread parts are different.

7. The power transmission belt according to claim 1

7 **EP 0 583 963 A1** 8

wherein the power transmission belt is one of a V-ribbed belt, a low-edge V-belt, and a wrapped V-belt.

8. The power transmission belt according to claim 1 wherein the canvas layer comprises rubberized canvas that is on the outside surface of the belt body.

9. The power transmission belt according to claim 1 wherein the ends of the canvas layer each define a free edge and the free edges of the canvas layer ends are abutted to each other with the canvas layer assembled to the belt body.

10. The power transmission belt according to claim 1 wherein the ends of the canvas layer are sewn together by overlock machine-sewing.

11. The power transmission belt according to claim 1 wherein the compression section is made from rubber that is at least one of NR, SBR, CR and NBR.

12. The power transmission belt according to claim 11 wherein there are reinforcing fibers in the rubber of the compression section, said reinforcing fibers comprising at least one of a) synthetic fibers that are at least one of nylon, vinylon, polyester and aromatic polyamide and b) natural fibers that are at least one of cotton and pulp.

13. The power transmission belt according to claim 1 wherein the canvas layer comprises at least one of a) cloth made of at least one of cotton, nylon, polyester, and aramid, b) a woven fabric, c) cord fabric, and d) nonwoven fabric comprising yarn fabric that is a blend of at least one of i) cotton and nylon and ii) cotton and polyester.

14. The power transmission belt according to claim 9 wherein the belt has a length and the free edges of the canvas layer are straight and make an angle with the length of the belt from 25-90°.

15. A power transmission belt comprising:
a belt body defining a tension section and a compression section and having an inside surface, an outside surface, and laterally spaced side surfaces; and
a canvas layer on at least one of the inside, outside, and side surfaces,
said canvas layer having a first surface abutting to the belt body and a second surface that is exposed with the canvas layer on the belt body,
wherein the canvas layer has ends joined to each other through the use of thread,

there being a first part of said thread that is exposed at the first surface of the canvas layer, said first thread part comprising a mono-filament thread of synthetic fibers.

16. A power transmission belt comprising:
a belt body defining a tension section and a compression section and having an inside surface, an outside surface, and laterally spaced side surfaces; and
a canvas layer on at least one of the inside, outside, and side surfaces,
said canvas layer having a first surface abutting to the belt body and a second surface that is exposed with the canvas layer on the belt body,
wherein the canvas layer has ends joined to each other through the use of thread,
there being a first part of said thread that is exposed on the second surface of the canvas layer and a second part of said thread that is exposed at the first surface of the canvas layer,
said first thread part comprising a twine,
said second thread part comprising a mono-filament.

17. The power transmission belt according to claim 16 wherein the power transmission belt is one of a V-ribbed belt, a low-edge V-belt, and a wrapped V-belt.

18. The power transmission belt according to claim 16 wherein the canvas layer comprises rubberized canvas that is on the outside surface of the belt body.

19. The power transmission belt according to claim 16 wherein the ends of the canvas layer each define a free edge and the free edges of the canvas layer ends arc abutted to each other with the canvas layer assembled to the belt body.

20. The power transmission belt according to claim 16 wherein the canvas layer comprises at least one of a) cloth made of at least one of cotton, nylon, polyester, and aramid, b) a woven fabric, c) cord fabric, and d) nonwoven fabric comprising yarn fabric that is a blend of at least one of i) cotton and nylon and ii) cotton and polyester.

EP 0 583 963 A1

FIG 1



FIG 2



EP 0 583 963 A1



FIG 3
(PRIOR ART)

EP 0 583 963 A1



European Patent
Office

## EUROPEAN SEARCH REPORT

Application Number

EP 93 30 6448

| | DOCUMENTS CONSIDERED TO BE RELEVANT | | |
|---|---|---|---|
| Category | Citation of document with indication, where appropriate, of relevant passages | Relevant to claim | CLASSIFICATION OF THE APPLICATION (Int. Cl.5) |
| X | EP-A-0 481 652 (MITSUBOSHI BELTING) * Column 5, lines 32-58; column 7, lines 3-37; figure 1 * & US-A-5 224 905 (Cat. D) | 1,3,7,8 ,9,10, 11,12 | F 16 G   5/06 F 16 G   1/08 |
| A | --- | 16-20 | |
| X | EP-A-0 260 890 (MITSUBOSHI BELTING) * Column 5, lines 1-5,25-30; figure 2 * | 1,4,9, 13,15 | |
| A | ----- | 2,16,19 ,20 | |
| | | | TECHNICAL FIELDS SEARCHED (Int. Cl.5) |
| | | | F 16 G |

The present search report has been drawn up for all claims

| Place of search | Date of completion of the search | Examiner |
|---|---|---|
| THE HAGUE | 20-10-1993 | BARON C |

CATEGORY OF CITED DOCUMENTS

X : particularly relevant if taken alone
Y : particularly relevant if combined with another document of the same category
A : technological background
O : non-written disclosure
P : intermediate document

T : theory or principle underlying the invention
E : earlier patent document, but published on, or after the filing date
D : document cited in the application
L : document cited for other reasons

& : member of the same patent family, corresponding document

EPO FORM 1503 03.82 (P0401)

**EXHIBIT 6**

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.), 33 U.S.P.Q.2d 1149
**(Cite as: Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.))**

**H** Xilinx, Inc. v. Altera Corp.
N.D.Cal.,1994.

United States District Court, N.D. California.
XILINX, INC., a Delaware Corporation, Plaintiff,
v.
ALTERA CORPORATION, a, California
Corporation, Defendant.
**No. C 93-20709 RMW (EAI).**

Feb. 8, 1994.

Richard Grossman, Vernon Norviel, Townsend and
Townsend Khourie and Crew, San Francisco, CA.
Herbert Schwartz, Robert Goldman, Fish & Neave,
New York City.
Alan MacPherson, Robert Morrill, Anthony de
Alcuaz, Joseph Greco, Kenneth Leeds, Scott Brown,
Peter Kang, Skjerven, Morrill, MacPherson, Franklin
& Friel, San Jose, CA.
Robert Hinckley, Xilinx Corp., San Jose, CA.

ORDER GRANTING PLAINTIFF'S MOTION TO
STRIKE

WHYTE, District Judge.
**\*1** The motion to strike of plaintiff XILINX, INC.
("Xilinx"), was heard on February 4, 1994. The court
has read the moving papers and the opposition papers
of defendant ALTERA CORPORATION ("Altera")
and heard the oral argument of counsel. GOOD
CAUSE APPEARING therefor,

The court grants plaintiff's motion to strike
defendant's affirmative defense of inequitable
conduct in the United States Patent and Trademark
Office because defendant has not properly pleaded
the requisite intent for this affirmative defense. The
court also grants plaintiff's motion to strike
defendant's affirmative defense of unclean hands,
because that defense, as pleaded, is not a proper
affirmative defense.

I. Background

On June 7, 1993, Xilinx filed suit against Altera
alleging infringement of two patents: United States

Patent No. 4,870,302("the '302 patent" or "Freeman
patent") and United States Patent No. 4,642,487("the
'487 patent" or "Carter patent"). Both these patents
deal with integrated circuits which perform logic
functions.

In its answer filed on July 28, 1993, Altera asserted a
number of affirmative defenses. On October 25,
1994, this court granted the defendant's motion to
strike two of those affirmative defenses with leave to
amend. In that order, the court held that Rule 9(b)'s
requirement of pleading fraud with particularity
applied to the affirmative defense of inequitable
conduct, and that Altera had not pleaded that
affirmative defense with the requisite particularity.
The court also held that while Rule 9(b) did not
technically apply to pleading the affirmative defense
of unclean hands, Altera ought to plead that defense
so as to give notice of the nature of the defense to
Xilinx.

On November 15, 1993, Altera filed its amended
answer re-alleging the affirmative defenses of
inequitable conduct and unclean hands. Xilinx has
again moved to strike these two affirmative defenses
pursuant to Rules 9(b) and 12(f). The two amended
affirmative defenses which are the subject of Xilinx's
motion to strike are at paragraphs twenty (20) and
twenty (22) of Altera's Amended Answer and are as
follows:

20. Upon information and belief, the '302 and '487
patents are unenforceable because they were obtained
by Xilinx through inequitable conduct in the United
States Patent and Trademark Office. During the
prosecution of these patents, at least the following
prior art references were neither cited by the patent
examiner nor called to the patent examiner's attention
by Xilinx: a 1967 article by Wahlstrom titled
"Programmable logic arrays-cheaper by the
millions"; (2) Wahlstrom United States Patent No.
3,473,160 issued on October 14, 1969; (3) a 1970
doctoral thesis by Shoup titled "Programmable
Cellular Logic Arrays"; and (4) a 1975 doctoral
thesis by Manning titled "Automatic Test,
Configuration, and Repair Cellular Arrays." In
addition, the materiality of other prior art, e.g.
Manning United States Patent No. 4,020,469 was not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                              Page 2
Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.), 33 U.S.P.Q.2d 1149
**(Cite as: Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.))**

disclosed to the patent examiner. Each of these five references was material to the patentability of the patents in suit. Upon information and belief, those acts and omissions by or on behalf of Xilinx were either intentional or evidence an intentional disregard of Xilinx's duty of disclosure to the Patent and Trademark Office and had the effect of depriving the Patent and Trademark Office of an opportunity to consider fairly whether or not the '302 and '487 patents should have issued.

**\*2** 22. Upon information and belief, Xilinx's claims for equitable relief are barred by the doctrine of unclean hands. Xilinx has commenced and continues this lawsuit in a bad faith attempt to interfere improperly with Altera's relationships with its customers and prospective customers. Xilinx threatened Altera with infringement litigation months before it first obtained and tested Altera's FLEX products. Xilinx personnel have also made false or misleading statements to Altera's customers or potential customers concerning the continued availability of Altera's products.

## II. Legal Standards

Motions to strike are governed by Federal Rule of Civil Procedure 12(f) which provides:

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

As with a motion to dismiss, when ruling on a motion to strike a court must view the pleadings in the light most favorable to the non-moving party. *State of California v. United States,* 512 F.Supp. 36, 39 (N.D.Cal.1981). Motions to strike are generally disfavored. *Id.* at 38 (citing 5A Wright & Miller, *Federal Practice and Procedure* § 1381 (2d ed. 1990)). "However, where the motion may have the effect of making the trial of the action less complicated, or have the effect of otherwise streamlining the ultimate resolution of the action, the motion to strike will be well taken." *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1528 (9th Cir.1993), *cert.*

*granted,*113 S.Ct. 2992 (June 21, 1993) (citing *State of California, supra,* 512 F.Supp. at 38).

Federal Rule of Civil Procedure 9(b) provides:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

As such, "allegations of fraud must be pleaded with specificity as to time, place and content of any misrepresentations or else be stricken." *Intel Corp. v. Hyundai Electronics America, Inc.,* 692 F.Supp. 1113, 1116 (N.D.Cal.1987). Applying these standards, the court finds as follows:

## III. Analysis

### A. Inequitable Conduct Defense

"Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Medical Consultants v. Holister, Inc.,* 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied,*490 U.S. 1067 (1989); *Labounty Mfg., Inc. v. U.S. Intern. Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992). Therefore, "intent to deceive the PTO is a required element of inequitable conduct and, further, requires a high level of proof." *Paragon Podiatry Laboratory v. KLM Laboratories,* 984 F.2d 1182, 1189 (Fed.Cir.1993); *Kimberly-Clark v. Proctor & Gamble,* 973 F.2d 911, 918 (Fed.Cir.1992).

**\*3** Xilinx agues that the court should strike Altera's affirmative defense of inequitable conduct because Altera has failed to plead a required element of the affirmative defense, namely an intent to deceive. In response Altera apparently makes two arguments. First, Altera argues that intent can be inferred from the circumstances surrounding the patent prosecution and that Altera, therefore, need not provide direct evidence of Xilinx's culpable intent. Altera's argument is correct but misplaced and premature. Altera's eventual ability to prove Xilinx's intent to deceive and Altera's need to plead that intent in its answer, are two entirely different matters. Second, Altera argues that it has pleaded the requisite intent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.), 33 U.S.P.Q.2d 1149
**(Cite as: Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.))**

by pleading that Xilinx's acts or omissions (e.g. not citing prior art to the PTO) were either "intentional or evidence an intentional disregard of Xilinx's duty of disclosure to the Patent and Trademark Office." These allegations may allow the court to infer that Altera is alleging that Xilinx knew or should have known of the prior art and its materiality. However, intentionally failing to cite prior art to the PTO or intentionally disregarding one's duty of disclosure to the PTO is not necessarily tantamount to doing those same intentional acts with an intent to deceive the PTO. Altera's opposition brief clarifies why this is the case:

The issue to be decided on this motion is whether, assuming that the allegations in Paragraph 20 of Altera's amended complaint are true, Altera will have established that the patents in suit are unenforceable for inequitable conduct during the prosecution of those patents in the Patent Office. (Opp.Brief at 8:5-10).

Under the Altera's amended answer as it now stands, the response to this question must be "no." Even if Altera proved every allegation in paragraph 20, it would not have proven that Xilinx intended to deceive the PTO, and, as noted, an intent to deceive the PTO is a necessary element of this defense. If Altera believes it can later prove that Xilinx intended to deceive the PTO-whether through direct or circumstantial evidence-Altera's pleading should, at the very least, reflect that belief.[FN1] *See Energy Absorption Sys., Inc. v. Roadway Safety Serv., Inc., 28 U.S.P.Q.2d 1717 (N.D.Cal.1993)* (Rule 9(b) requires defendant to allege with specificity why or how plaintiffs misrepresentation constituted inequitable conduct in the PTO). Therefore, the defense of inequitable conduct is stricken with twenty days leave to amend.

## B. Unclean Hands

Altera's attempt to plead the affirmative defense of unclean hands suffers from a defect that is similar, although not identical, to the one discussed above. In its opposition, Altera states that "the unclean hands defense asserts that Xilinx first threatened suit and then brought suit in bad faith, *without a good faith belief that the patents were infringed,* to interfere improperly with Altera's business relationships." (Opp.Brief at 3:2-6, emphasis added). Notably, the

sentence highlighted above is absent from paragraph 22 of the amended answer. Thus, it is not entirely clear whether Altera is alleging that Xilinx brought and is prosecuting this action without a good faith belief that Altera infringed or whether Altera is simply claiming that while Xilinx may have a good faith belief that Altera infringed, that was not its only motive for bringing suit. Regardless of which version Altera means to plead, the affirmative defense is defective. Altera has not alleged in its answer nor explained in its papers how Xilinx's alleged bad faith relates to Xilinx's patent infringement claims against Altera. As the Ninth Circuit stated over thirty years ago,

**\*4** Misconduct in the abstract, unrelated to the claim to which it is asserted as a defenses, does not constitute unclean hands ... What is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now seeks to assert, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant.

*Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 349 (9th Cir.1963); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245 (1933)* (courts require clean hands only where unconscionable act has immediate and necessary relation to the equity he seeks in respect of the matter of litigation). The court went on to address patent cases specifically:

Where unclean hands has been asserted to bar a claim of infringement, it has usually been because the patent was fraudulently obtained, or there has been concealment of evidence ... or perhaps, more remotely, the patent was being misused, as, for example, in violation of the Sherman Act.

*Id.* at 350; *see also, National Presto Indus. v. Black & Decker, Inc., 760 F.Supp. 699, 702 (N.D.Ill.1991)* (threatening retailers and competitors not an affirmative defense of unclean hands where issues are infringement and priority); *Southwire Co. v. Essex Group, Inc., 220 U.S.P.Q. 1053, 1055 (N.D.Ill.1983)* (burglary to investigate infringement bears no relation to validity or infringement).[FN2] Here, Altera has pleaded nothing to demonstrate how the alleged acts of Xilinx would bar Xilinx's claim of infringement. Finally, Altera argues that even if Xilinx proves the validity of one patent-in-suit, Xilinx's alleged bad faith regarding the other patent-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.), 33 U.S.P.Q.2d 1149
**(Cite as: Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.))**

in-suit might prevent this court from ordering an injunction on the valid patent. This argument suffers from the problem discussed directly above. Further, in *Consolidated Aluminum, supra,* 910 F.2d 804, cited by Altera, the court specifically found that the inequitable conduct by the plaintiff regarding one patent (fraud on the PTO) had "an immediate and necessary relation" to the other patents because it "permeated the prosecution of the other patents-in-suit...." *Id.* at 810. That is an entirely different situation from the one Altera claims to be present in this case. The unclean hands alleged by Altera does not involve an intent to deceive the PTO with respect to related patent applications. Accordingly, the court hereby strikes Altera's unclean hands defense, but grants Altera twenty days leave to amend.

### IV. Order

Given the above discussion and GOOD CAUSE APPEARING therefor, the court grants Xilinx's motion to strike Altera's affirmative defenses of "inequitable conduct" and "unclean hands" at paragraphs 20 and 22 of the Amended Answer. Pursuant to Federal Rule of Civil Procedure 15(a), Altera is granted leave to file an amended pleading in compliance with this order within twenty days of the date of this order.

> FN1. Altera's citation to *Consolidated Aluminum Corp. v. Foseco Intern. Ltd.,* 910 F.2d 804, 809 (Fed.Cir.1990), does not change this result. In that case, the district court's order reflected a finding of "intentional concealment." The Federal Circuit merely held that this finding was equal to a finding of intent to deceive even though the district court did not specifically use the words "intent to deceive." Here, the court is not asking for a particular phrase but rather requiring Altera to plead a requisite element of the defense alleged.

> FN2. The circumstances of *Gardiner v. Gendel,* 727 F.Supp. 799, 804 (E.D.N.Y.1989), *aff'd without published opinion,* 976 F.2d 746 (Fed.Cir.1992), as well as the other cases cited By Altera, are all distinguishable from the case at hand. For example, in *Gardiner,* the court specifically found that the plaintiffs sent cease and desist

letters and threatened infringement suits at a time when the plaintiffs knew that they had no patent rights at all. Moreover, the court only commented on the plaintiffs "litigation conduct" in light of its decision to find the case was "exceptional" under 35 U.S.C. § 285, thus entitling the defendants to attorney fees.

N.D.Cal.,1994.

Xilinx, Inc. v. Altera Corp.

Not Reported in F.Supp., 1994 WL 782236 (N.D.Cal.), 33 U.S.P.Q.2d 1149

END OF DOCUMENT